[Nos. 40279, 40639.   En Banc.   October 23, 1969.]

UNITED PACIFIC INSURANCE COMPANY, *Respondent*, v. PHILIP B. LUNDSTROM *et al.*, *Appellants.**

*Reported in 459 P.2d 930.

*Robbins, Felix, Robbins & Kraft,* by *Jennings P. Felix,* for appellants Lundstrom.

*Uziel & Faltys,* by *John H. Faltys,* for appellant Milmanco Corporation.

*Breskin, Rosenblume & Robbins,* by *Arnold B. Robbins,* for respondent.

McGovern, J.—Defendants Lundstrom appeal from a $473,419.09 judgment entered against them in favor of the United Pacific Insurance Company. Milmanco Corporation appeals from an order awarding the Lundstroms a judgment over and against Milmanco Corporation in such amounts as the Lundstroms should from time to time pay upon the judgment in favor of United Pacific Insurance Company. Considered contemporaneously herewith is the refusal of the trial court to quash United Pacific Insurance Company's writ of attachment levied upon Lundstrom's cause of action against Milmanco Corporation before judgment.

Plaintiff United Pacific Insurance Company is hereafter referred to as "United"; defendants Philip and Elizabeth Lundstrom and their marital community are together referred to as "Lundstrom"; Milmanco Corporation is referred to as "Milmanco"; International Productions, Inc., formerly International Video Tape and Productions, Inc., is referred to as "International"; and Willamette Construction Company is referred to as "Willamette".

The facts generally are these: Lundstrom and Mr. Thomas H. Cooke carried on a joint business venture preparing and producing military and other technical manuals for the government and for private industry. May 17, 1961, Milmanco was formed and the stock was held in approximately equal amounts by Lundstrom and Mr. Cooke. Subsequently, International, a Milmanco creditor, acquired one third of the stock, subject to Milmanco's right to repurchase.

March, 1963, Willamette was activated. Lundstrom and

Mr. Cooke each acquired one fourth of its capital stock and the remainder was held by Lundstrom's brother, John Lundstrom, a man experienced in the engineering and construction of bridges and aerial tramways. July 24, 1963, Willamette was awarded an $815,000 contract to construct an aerial ski tramway at Jackson Hole, Wyoming. July 31, 1963, United issued its performance bond in favor of the Jackson Hole Ski Corporation.

Willamette became indebted to Milmanco in the sum of $100,799.89. Thereafter Milmanco subordinated its rights to any claim which United might subsequently have against Willamette on account of the performance bond issued by United for the Jackson Hole contract. December 31, 1963, John Lundstrom, Philip Lundstrom and Milmanco executed and delivered to the Jackson Hole Ski Corporation a letter agreement which stated "We hereby guarantee performance and completion of the subject contract," referring to the aerial tramway project.

Willamette thereafter experienced considerable difficulty in performing its obligations under the construction contract. Its cash needs became such that on July 8, 1965, Mr. Cooke, Philip Lundstrom, John Lundstrom and a bank representative met with United officials to discuss the possibility of refinancing the corporation. As a result of that meeting: (1) Willamette admitted that it was in default on the construction contract and no longer able to operate; (2) Carl M. Halvorson, Inc., a construction company, was invited to bid on a contract to complete the work which Willamette was not able to finish; (3) United advanced the sum of $74,755.44 to make possible the acquisition of certain cable needed for the aerial tramway; and (4) United, Willamette, Milmanco, Philip Lundstrom and John Lundstrom each executed an agreement to hold United harmless from any and all losses incurred or to be incurred by United on account of its performance bond issued for the Jackson Hole contract.

July 28, 1965, United accepted the bid of Carl M. Halvorson, Inc. to complete the Jackson Hole contract for a price of $665,900. John Lundstrom, his wife Margaret, and Mil-

manco agreed to pay United that sum and pledged certain collateral to United in order to secure their promise. Philip Lundstrom later executed the same agreement in favor of United when Milmanco adopted a corporate resolution agreeing to reimburse him in such sums as he should thereafter pay United. As collateral security for his promise to pay, Lundstrom mortgaged his home and pledged his shares of capital stock in Milmanco to United.

Lundstrom first argues that the December 31, 1963, guarantee to Jackson Hole Ski Corporation that the construction contract would be performed was not an enforceable agreement. He claims that it failed for want of legal consideration. The trial court, however, concluded that the presence or absence of consideration for that promise was of no significance to the case and we concur in that view. The judgment appealed from was in no way predicated upon the necessity of consideration for the guarantee. The findings did not advance facts upon which consideration might be predicated nor did the conclusions assert the existence of consideration for the promise. None were required or essential to the judgment that issued.

█ It is next said that United's payment and performance bond to the Jackson Hole Ski Corporation was in law a surety bond and not an indemnity bond as determined by the trial court. The pertinent portion of the bond reads as follows:

> if [Willamette] shall indemnify [Jackson Hole Ski Corporation] against loss or damage arising by reason of the failure of [Willamette] to perform said contract according to its terms and conditions or to pay for labor performed or material furnished in connection with the performance of said contract, then this obligation shall be void, otherwise to remain in full force and effect.

Stated otherwise, United thereby promised to pay Jackson Hole Ski Corporation's loss if (1) such loss was caused by Willamette's failure either to perform the contract, or to pay for labor performed or material furnished to the job, and (2) Willamette failed to reimburse Jackson Hole Ski Corporation for such loss. United's promise to the obligee was

conditional. United did not bind itself as principal; it merely promised to secure or save Jackson Hole Ski Corporation harmless against any loss or damage which might occur as the result of a Willamette default. It was a contract of indemnification and not of suretyship. 41 Am. Jur. 2d *Indemnity* § 4 (1968).

It is then claimed that the July, 1965 agreements under which Lundstrom and Milmanco agreed to hold and save United harmless from loss because of its payment and performance bond, and by the terms of which Lundstrom and Milmanco became indebted to United in the sum of $665,900, were not enforceable agreements because of the absence, or insufficiency, of consideration to Lundstrom. The learned trial court recited in detail the facts upon which he premised his conclusion that there was adequate consideration and we are in accord with his findings. We adopt the court's appraisal of the consideration question as follows:

Mr. Lundstrom's agreement to United Pacific is supported by valid and adequate consideration. . . .

. . .

At the time of signing with United Pacific Mr. Lundstrom did gain from that entire transaction a complete release from whatever liability he might have had by his signature on the construction contract itself. And Willamette and Milmanco gained similar complete releases from Jackson Hole. This was of definite value to Mr. Lundstrom, to keep those two companies operating and free from the entanglements and stigmas of a lawsuit for not completing the job. Mr. Lundstrom had signed Exhibit No. 12 on July 8, 1965 prior to the final signings on July 23rd and in Exhibit No. 12 Mr. Lundstrom had agreed to hold the United Pacific harmless on any loss on its bond on the Jackson Hole job.

I find that there was consideration running to Mr. Lundstrom for the July 8, 1965 signature. But even if there was not he had his signature on an agreement to hold United Pacific harmless. United Pacific at that time could suffer the loss and sue Mr. Lundstrom on that signature.

One of the things Mr. Lundstrom faced among other things was a suit by United Pacific on the July 8th signature.

The new arrangement entered into got Mr. Halvorson on the job and relieved Mr. Lundstrom of that threat of a lawsuit. This new agreement signed up on July 23rd substituted a new contractor and it substituted a new course of action, one which Mr. Lundstrom at that time thought was beneficial. The agreement with Mr. Halvorson was firmed up and made at that time. There had not been an agreement made with Mr. Halvorson earlier although there had been explorations.

The entire arrangement on July 23, 1965 was a beneficial course of action to Mr. Lundstrom. He wanted the job undertaken and completed to avoid being sued, to avoid possible damages that he would be sued for, for the loss of a ski season.

Now, all of the other parties wanted these same things, too, but that does not alter the fact that this was a beneficial course of action that Mr. Lundstrom wanted. He was willing to undertake certain obligations to United Pacific in exchange for their agreement to carry forth this course of action which United Pacific undertook.

United Pacific undertook to make expenditures on its behalf pursuant to this arrangement that was entered into. There were many courses of action that United Pacific could have taken at that time. The bond obligated them to indemnify Jackson Hole. Now, whether it imposed other legal duties and obligations on United Pacific at that time is pretty much beside the point because there were many courses of action that the bonding company could have taken at that time. They agreed to carry forward in a particular way. This is the very essence of what consideration is all about, a mutual agreement to undertake certain courses of action which are not specifically compelled and required.

There were no conditions attached to the agreements that Mr. Lundstrom signed on July 23rd.

It is also worth note that Exhibit No. 13 which was entered into by Mr. Lundstrom, an experienced businessman, advised by counsel, specifically recites and agrees that the prior agreements had been for valuable consideration. The party himself recognized in a very formal way what the Court is now finding.

Lundstrom next asserts that as a matter of law he was released from any liability to United on his promise to pay it $665,900 because United dismissed with prejudice its claim against Milmanco on September 19, 1966. He rationalizes that assertion on the theory that Milmanco was indebted to United under the same agreement and that he, Lundstrom, was merely a surety on that debtor-creditor relationship. He says that the release of the debtor released him.

The contract in question, executed by Milmanco on July 20, 1965, and by Lundstrom on July 28, 1965, was not one of suretyship. The agreement itself indicates otherwise. It provides in part that "Indemnitors individually, jointly and severally agree as follows" and that "Each Indemnitor acknowledges his several obligation hereunder and expressly agrees that no objection will be taken in such suit, action or other proceeding that other indemnitors may not have been joined as parties thereto."

The obligation of Lundstrom to United was therefore joint and several. And the release of one of several joint contract debtors does not in law operate to release the other contract debtors. Some years ago we drew a distinction between situations involving the release of one of many joint *contract* debtors as distinguished from those involving the release of one of several joint *tort-feasors*. In *Johnson v. Stewart*, 1 Wn.2d 439, 96 P.2d 473 (1939) we said:

> The doctrine that one joint contract debtor is released from all obligations by the release of his codebtor, even though the debt is not fully paid, is rather technical, and unless the interests of the unreleased debtor have somehow been prejudiced, is a principle which should not be extended.

We declared that the intention of the parties should be the controlling factor and we still adhere to that theory.

Here the release of Milmanco was limited to Milmanco alone. There was no indication that it was intended to include others, and we are aware of no justifiable reason for extending it to defendant Lundstrom. We concur in

the trial court's conclusion that the release of Milmanco did not operate to release any of the other joint and several contract obligors.

It is then claimed that Lundstrom's pledge of his Milmanco stock to United was of no legal effect because he did not physically deliver to United the certificates of title which represented the pledged shares of stock. The trial court found the argument to be without merit and we concur.

The facts are that the same stock had been previously pledged to a bank and to International and the certificates representing those shares were then in possession of the bank. The certificates could not therefore be delivered to United and that circumstance was known and considered by the parties when Lundstrom executed the pledge to United. The last paragraph of that pledge agreement provides:

It is understood and agreed that certificates representing some of the corporate shares of stock hereinabove pledged may be subject to prior pledge. The parties are agreed that they will join in arranging for the delivery of certificates representing said shares to pledgee as soon as practicable after the debts for which said certificates have been previously pledged are satisfied.

RCW 23.80.100 was then the applicable law. It recognized the efficacy of an attempted stock transfer without physical delivery of the certificate. It provided:

An attempted transfer of title to a certificate or to the shares represented thereby without delivery of the certificate shall have the effect of a promise to transfer and the obligation, if any, imposed by such promise shall be determined by the law governing the formation and performance of contracts.

At least, then, the pledge agreement constituted a promise by Lundstrom to deliver the certificates to United after all prior rights to the shares of stock represented by those certificates had been discharged. And here the record sustains the conclusion of the trial court that the rights of the bank and of International to the certificates had been fully

satisfied at the time of trial. That being so, and there being no other third person claiming a superior equity to the stock, the trial court was correct in holding that United was entitled to receive the certificates. The foreclosure on the pledged stock then properly followed.

Lundstrom's remaining two assignments of error, including his charge of conspiracy lodged against United and Mr. Cooke, have been fully considered and found wanting of merit.

We turn now to Milmanco's appeal from the order awarding Lundstrom a judgment over and against Milmanco in such monetary amounts as Lundstrom should from time to time pay to plaintiff upon the judgment granted to United. The basis of the order was Milmanco's agreement to do so.

■ It is argued that the trial court erred in finding that Lundstrom pledged his personal assets to United for the benefit of Milmanco. We, however, agree with the finding. Our examination of the record reveals that Milmanco was being threatened with lawsuits on account of Willamette's failure to perform its Jackson Hole contract and on account of Milmanco's guarantee that Willamette would perform that contract. Milmanco therefore wanted United to advance approximately $75,000 cash so that needed aerial cable could be acquired for the tramway construction. United was not obligated to advance the money and stated that it would not do so unless Lundstrom, among other things, pledged his personal assets to United. Lundstrom thereafter executed the pledge—to Milmanco's benefit. Additionally, the corporate minutes of the July 27, 1965 special meeting of the board of directors of Milmanco acknowledged that Lundstrom had obligated himself personally for the benefit of Milmanco. The finding of the trial court was therefore supported by substantial competent evidence and will not be disturbed. *Wells v. Scott,* 75 Wn.2d 922, 454 P.2d 378 (1969).

The preceding analysis also answers Milmanco's contention that it received no consideration for its promise to

indemnify Lundstrom. That argument, too, is without merit.

Equally failing is Milmanco's contention that its indemnification to Lundstrom was invalid because its corporate action in passing the resolution was fatally defective. The trial court found under disputed evidence that the motion to indemnify Lundstrom was unanimously carried at a meeting of Milmanco shareholders and directors called for the purpose of considering that motion and other business. Seattle attorney Richard A. Clark testified that Mr. Cooke made the motion, that Mr. Hurtgen, the corporate secretary, seconded the motion, and that all persons present voted in favor of it. The corporate records indicate the same thing. The finding of the trial court is therefore adequately supported by the record and will not be disturbed.

The fact that Lundstrom voted in favor of the motion is also of no consequence. The other two directors voted for it and so did other shareholders representing two thirds of the company's outstanding corporate stock. All shareholders attended the meeting either personally or by proxy, and each person present had an opportunity to be heard. There were no legal deficiencies to the corporate meeting or to the resolution which was unanimously adopted at the meeting.

The remaining assignments of error claimed by Milmanco have been considered and found to be without sufficient merit.

Subsequent to the entry of judgment in this case, Lundstrom petitioned this court for a writ of certiorari to review an order of the superior court denying Lundstrom's motion to quash the attachment and stay the sheriff's sale of his rights under the judgment against Milmanco. The petition was granted and the matter is now considered on the merits.

United levied a writ of attachment upon Lundstrom's cause of action against Milmanco before the trial court entered judgment upon the claim. Thereafter the lien of United's writ of attachment was specifically reserved in the judgment. Still later, the sheriff's attempt to comply with

an order of sale of the claim was subjected to a motion to quash the sale.

▮  Under the common law, such a chose in action was not subject to execution. We abrogated that common law, however, when we enacted what is now RCW 6.04.060: "All property, real and personal, of the judgment debtor, not exempted by law, shall be liable to execution." United refers us to that statutory provision and cites and relies upon *Johnson v. Dahlquist,* 130 Wash. 29, 225 P. 817 (1924), as authority for its position. In *Johnson,* the defendants appealed a judgment which had been entered against them in the trial court. We reversed, ordered a new trial and awarded defendants their costs on appeal. In an effort to collect their judgment for costs, defendants attached the cause of action upon which plaintiff's claim against them was predicated. We held that the unliquidated claim of indebtedness was property and was therefore properly subject to execution.

While the facts in *Johnson* are somewhat analogous to the facts before us, they are nonetheless distinguishable and the rule of law announced in *Johnson* is not applicable. To apply it here would be to extend its area of application.

The general rule throughout the country is that claims for unliquidated damages cannot be reached by attachment or garnishment process. 6 Am. Jur. 2d *Attachment and Garnishment* § 127 (1963). We accepted that principle in *Sundberg v. Boeing Airplane Co.,* 52 Wn.2d 734, 328 P.2d 692 (1958). The basis for the rule is that such claims are contingent or uncertain and therefore the amount to become due on the claim cannot be determined until it is reduced to judgment.

At the time of this attachment it was uncertain whether a sum of money would ever be due from Milmanco to Lundstrom. The problems of contingency, uncertainty, possibility and dependency that have caused most states to decree that such a claim cannot be attached were clearly present. But whereas in *Johnson* the value of the attached cause of action would be mathematically ascertainable when judgment was rendered on the claim, that was not true here.

The uncertainty and contingency still existed after Lundstrom had been awarded a judgment. The value of his judgment could not be mathematically calculated with any degree of certainty before something else happened. Lundstrom's judgment against Milmanco was only for such sums as he should thereafter pay on United's judgment against him. If he paid nothing, his judgment was worthless. If he paid some amount on United's judgment, then his judgment against Milmanco was worth at least an amount equal to what he had paid. His judgment against Milmanco did not therefore remove the uncertainty and the contingency which existed at the time of the attachment.

We are therefore constrained to hold that Lundstrom's unliquidated and contingent claim against Milmanco could not be legally attached at the time the writ issued.

The writ of attachment is therefore vacated and that portion of the judgment declaring the lien of the writ of attachment preserved is hereby declared to be of no force and effect. Otherwise, the judgment of the trial court is affirmed.

HUNTER, C. J., HILL, ROSELLINI, HAMILTON, HALE, and NEILL, JJ., and DONWORTH and COLE, JJ. Pro Tem., concur.

January 30, 1970. Petition for rehearing denied.