[S.F. No. 24873. Oct. 31, 1985.]

BRUCE COHEN et al., Plaintiffs and Appellants, v.
BOARD OF SUPERVISORS OF THE CITY AND COUNTY OF
SAN FRANCISCO et al., Defendants and Respondents.

278

282

COUNSEL

Friedman, Sloan & Ross, Jeffrey S. Ross, Sheila L. Sakamoto, Lynne N. Henderson and Lawrence A. Gibbs for Plaintiffs and Appellants.

Stephen E. Cone, Margaret C. Crosby, Alan L. Schlosser and Amitai Schwartz as Amici Curiae on behalf of Plaintiffs and Appellants.

George Agnost, City Attorney, Burk E. Delventhal, Judith A. Boyajian, Mara E. Rosales and Thomas J. Owen, Deputy City Attorneys, for Defendants and Respondents.

Gary R. Netzer, City Attorney (Los Angeles), Lewis N. Unger, Assistant City Attorney, and Pamela Victorine, Deputy City Attorney, as Amici Curiae on behalf of Defendants and Respondents.

OPINION

**BIRD, C. J.**—Is a San Francisco ordinance, which requires the operators of escort services and their employees to pay an annual license fee and acquire a permit from the chief of police before engaging in business, preempted by state law?

I.

On June 15, 1981, the Board of Supervisors for the City and County of San Francisco enacted Municipal Police Code sections 1074.1 through 1074.30, which regulate escort services located or operating within the city.[1] According to Mayor Dianne Feinstein, the ordinance was deemed necessary to "reduce the manpower needed to monitor and investigate illegal escort services" which "often serve as a front for individuals engaged in serious criminal activity . . . ."[2] The escort service ordinance became effective in July of 1981, but due to an administrative grace period and a subsequent stipulation by the parties in this litigation, the ordinance was not enforced until September 12, 1981.

On August 17, 1981, appellants, a San Francisco taxpayer and an attorney practicing in San Francisco, filed this action seeking declaratory and injunctive relief based on the claim that the ordinance was unconstitutional under the First, Fourth, Sixth, and Fourteenth Amendments to the federal Constitution and several provisions of the state Constitution. The trial court issued an order to show cause on appellants' application for a preliminary injunction and a hearing was held on September 3, 1981.

---

[1] All statutory references are to the San Francisco Municipal Police Code unless otherwise indicated.

[2] Members of the San Francisco Police Department echoed these sentiments in communications with the board about the proposed ordinance.

On September 11, 1981, the trial court denied the application for a preliminary injunction. After unsuccessfully seeking mandate from the Court of Appeal, appellants filed a notice of appeal from the trial court's order.[3]

The ordinance imposes a permit requirement upon any person engaged in, conducting, or carrying on the operation of an "escort service." (§ 1074.2.) An "escort service" is defined as "[a]ny business, agency or person who, for a fee, commission, hire, reward or profit, furnishes or offers to furnish names of persons, or who introduces, furnishes or arranges for persons, who may accompany other persons to or about social affairs, entertainments or places of amusement, or who may consort with others about any place of public resort or within any private quarters." (§ 1074.1.) Similarly, an "escort" is defined as "[a]ny person who, for a fee, commission, hire, reward or profit, accompanies other persons to or about social affairs, entertainments or places of amusement or consorts with others about any place of public resort or within any private quarters." (*Ibid.*)

In order to obtain an escort service permit, the applicant must fill out an application which calls for a personal description, a current and two previous addresses and a prior business or employment record. Also, three portrait photographs must be furnished, a listing of all criminal convictions except minor traffic violations must be provided, written proof of majority must be shown, and "[s]uch other identification and information necessary to discover the [foregoing] matters" must be submitted. (§ 1074.4.) The chief of police is permitted to take the applicant's fingerprints and additional photographs and may "confirm, by independent investigation, the truth and accuracy of the . . . information [provided in the application]." (*Ibid.*) The applicant must pay a filing fee and an additional fee of $500 to be used for the investigation. The unused portion of the latter fee is refunded upon conclusion of the investigation. (§ 1074.3.)

The ordinance also requires any escort or other employee who works in an escort service in San Francisco or performs any such service in the city

---

[3]After the notice of appeal was filed, both parties brought motions for summary judgment in the trial court. On February 18, 1983, the court granted summary judgment in defendants' favor as to all issues except the Fourth Amendment and state constitutional right of privacy claims.

Appellants failed to seek extraordinary relief from the trial court's summary judgment order. However, that omission does not bar review of the issues raised in this appeal. As appellants' counsel explained in a letter to the Court of Appeal, the failure to seek writ review of the summary judgment order resulted from the belief that such action would merely duplicate the issues already before the court on appeal. Moreover, at no time during the present appeal have respondents claimed the res judicata effect of the trial court's summary judgment order. Therefore, even assuming such a claim were valid, it has been waived. (See *Dillard* v. *McKnight* (1949) 34 Cal.2d 209, 219 [209 P.2d 387, 11 A.L.R.2d 835].)

to secure a permit. The employee permit application requires information similar to that required for a service permit. (§§ 1074.5, 1074.7.)

After the application is filed, the chief of police schedules a public hearing, a notice of which is posted "in a conspicuous place" on the premises in which the escort service is to be operated. (§ 1074.11.) A permit must be issued within 14 days following the hearing unless: (1) the operation "would not have complied with all applicable laws, including but not limited to, the Building, City Planning, Housing and Fire Codes of the City . . . and the rules and regulations adopted by the Chief of Police pursuant to this Article;" (2) the applicant has had a prior license revoked by the city, the state, or the Alcoholic Beverage Control Commission; or (3) the applicant has been convicted of any offense which (i) requires sex offender registration (Pen. Code, § 290), (ii) involves the "use of force and violence upon the person of another" or sexual misconduct with children, or (iii) is described in Penal Code sections 311, 647, subdivision (a), 647a, 647, subdivision (b), 315, 316, 318 or 266 through 267. (§ 1074.12.) A license fee is charged annually for the permit. (§ 1074.24.)

Beyond the permit process, the ordinance requires that both clients and employees be at least 18 years old (§§ 1074.16, 1074.17) and that each escort service keep a daily register containing the identity and hours of employment of each employee. The register must contain the "true" name and address of each patron, along with the hours, the fee charged, and the location where the service was used. This register is "at all times during business hours . . . subject to inspection" by the police and health departments and must be maintained on the premises for one year. (§ 1074.21.) The police department "shall, from time to time and at least twice a year," inspect each escort service "for the purposes of determining that there is compliance with the provisions of [the ordinance]." (§ 1074.20.)

Finally, the ordinance prohibits any escort from engaging "in any type of criminal conduct with a customer . . . ." (§ 1074.22, subd. (A).) No one may "permit, counsel or assist any other person in the violation" of the ordinance. (§ 1074.23.) Any wilful violation of the ordinance may result in criminal penalties of up to six months in jail, a fine of $1,000, or both, if the violation is charged as a misdemeanor or a fine of $500 if charged as an infraction. (§ 1074.26.)

Once issued, a permit may be revoked after a hearing if the permittee has engaged in conduct which violates any provision of the ordinance, any implementing rules and regulations adopted by the chief of police,[4] or any

---

[4] We are informed by the city attorney that no such regulations have yet been promulgated.

state or local law. Revocation may result "in any case where the permittee or licensee refuses to permit any duly authorized police officer . . . to inspect the premises or the operations therein . . . ." (§ 1074.15.)

## II.

The question presented by this appeal is whether the trial court abused its discretion in denying the application for the preliminary injunction.

■ "This court has traditionally held that trial courts should evaluate two interrelated factors when deciding whether or not to issue a preliminary injunction. The first is the likelihood that the plaintiff will prevail on the merits at trial. The second is the interim harm that the plaintiff is likely to sustain if the injunction were denied as compared to the harm that the defendant is likely to suffer if the preliminary injunction were issued. [Citations.]" (*IT Corp.* v. *County of Imperial* (1983) 35 Cal.3d 63, 69-70 [196 Cal.Rptr. 715, 672 P.2d 121]; accord *Robbins* v. *Superior Court* (1985) 38 Cal.3d 199, 206 [211 Cal.Rptr. 398, 695 P.2d 695].)[5] " '[By] balancing the respective equities of the parties, [the trial court] concludes that, pending a trial on the merits, the defendant should or that he should not be restrained from exercising the right claimed by him.' " (*Continental Baking Co.* v. *Katz* (1968) 68 Cal.2d 512, 528 [67 Cal.Rptr. 761, 439 P.2d 889].)

The granting or denying of a preliminary injunction does not constitute an adjudication of the ultimate rights in controversy. (*Robbins* v. *Superior Court, supra,* 38 Cal.3d at p. 218; *IT Corp.* v. *County of Imperial, supra,* 35 Cal.3d at pp. 75-76.) ■ Generally, the ruling on an application for a preliminary injunction rests in the sound discretion of the trial court. The exercise of that discretion will not be disturbed on appeal absent a showing that it has been abused. (*Id.,* at p. 69; *Continental Baking Co.* v. *Katz, supra,* 68 Cal.2d at p. 527.)

■ When a trial court denies an application for a preliminary injunction, it implicitly determines that the plaintiffs have failed to satisfy either or both of the "interim harm" and "likelihood of prevailing on the merits" factors. On appeal, the question becomes whether the trial court abused its discretion

---

[5]Respondents assert that there are actually five factors to consider in determining whether a preliminary injunction should issue: (1) the inadequacy of any other remedy; (2) the degree of irreparable injury the denial of the injunction will cause; (3) the necessity to preserve the status quo; (4) the degree of adverse effect on the public interest or interests of third parties the granting of the injunction will cause; and (5) the likelihood of prevailing on the merits.

As their trial brief indicates, respondents compiled this list from several reported California cases involving preliminary injunctions. No single case, however, incorporates all five factors. Several of these purported requirements are simply different ways of describing the "interim harm" factor noted above.

in ruling on *both* factors. Even if the appellate court finds that the trial court abused its discretion as to one of the factors, it nevertheless may affirm the trial court's order if it finds no abuse of discretion as to the other.

Appellants argue, however, that a different standard applies in reviewing a ruling on an application for a preliminary injunction where the validity of the challenged legislation presents only a question of law. In such instances, they assert, the appellate court is not limited to determining whether the trial court abused its discretion in ruling on the "interim harm" and "likelihood of prevailing on the merits" factors, but instead may adjudicate the merits of the challenged legislation as though the case had proceeded to trial.

In support of their argument, appellants cite several appellate decisions which have proceeded to determine the merits of facial constitutional attacks on legislation without analyzing whether the trial court abused its discretion under the traditional two-part test. (*Palos Verdes Shores Mobile Estates, Ltd.* v. *City of Los Angeles* (1983) 142 Cal.App.3d 362, 368 [190 Cal.Rptr. 866]; *Ortiz* v. *Woods* (1982) 129 Cal.App.3d 672, 676 [181 Cal.Rptr. 209]; *North Coast Coalition* v. *Woods* (1980) 110 Cal.App.3d 800, 804-805 [168 Cal.Rptr. 95]; by implication see also *City of Santa Barbara* v. *Adamson* (1980) 27 Cal.3d 123 [164 Cal.Rptr. 539, 610 P.2d 436, 12 A.L.R.4th 219].)

Each of these decisions involved an appeal from an order granting a preliminary injunction. In these cases, appellants note, no material factual questions had to be resolved to determine the constitutionality of the legislation, and the appellate court concluded that it was in as good a position as the trial court after decision on the appeal to determine the constitutionality of the challenged legislation.

Since the present appeal involves a facial attack and raises no factual questions, they argue, this court may resolve the merits of appellants' constitutional challenge without resort to the abuse of discretion standard and the traditional two-part test.

The cited cases are not apposite here. In *City of Santa Barbara* v. *Adamson, supra,* 27 Cal.3d 123, for example, the trial court, acting under an ordinance restricting the number of unrelated adults who could live in the same household, enjoined a group of adults from living together. On appeal, this court held the ordinance unconstitutional, reversed the order granting the preliminary injunction, and remanded for further proceedings. (*Id.,* at pp. 132-134, 137.) There is no indication in the opinion, however, that either party argued that this court was limited to a review of the trial court's

discretion or that either party framed the issues in terms of whether the trial court had erred in implicitly finding for the city on the "interim harm" and "likelihood of prevailing on the merits" factors.

*North Coast Coalition* v. *Woods, supra,* 110 Cal.App.3d 800 is similar. There, the trial court had preliminarily enjoined the enforcement of certain welfare regulations which required reduction of recipients' welfare grants. There is no indication that on appeal the state took issue with the trial court's implicit finding that the plaintiff had satisfied the "interim harm" factor. The only remaining question was whether the trial court had erred in ruling for the plaintiff on the "likelihood of prevailing on the merits" factor. Since no factual questions were involved, the Court of Appeal could finally determine the validity of the challenged actions because it was "in as good a position to resolve the issue now as the trial court would be after determination of [the] appeal [from the order granting the preliminary injunction]." (*Id.,* at p. 805; accord *Palos Verdes Shores Mobile Estates, Ltd.* v. *City of Los Angeles, supra,* 142 Cal.App.3d at p. 368; *Eckl* v. *Davis* (1975) 51 Cal.App.3d 831, 835 [124 Cal.Rptr. 685] ["The parties have not undertaken to discuss specifically the question of whether the trial court abused its discretion in denying a preliminary injunction . . . ."]; see also *District Election etc. Committee* v. *O'Connor* (1978) 78 Cal.App.3d 261 [144 Cal.Rptr. 442].[6])

In some cases involving the grant of preliminary injunctive relief to plaintiffs bringing facial attacks on local regulations, the Courts of Appeal have limited their review to whether the trial court correctly applied the two-part test. For example, in *EWAP, Inc.* v. *City of Los Angeles* (1979) 97 Cal.App.3d 179 [158 Cal.Rptr. 579], the Court of Appeal held that an ordinance requiring a picture arcade proprietor to obtain a permit was partially invalid as an unconstitutional prior restraint on freedom of expression. (*Id.,* at pp. 184-188.) The court reversed the trial court's order granting a preliminary injunction against the city since the arcade proprietors had failed to show that they would be denied such a permit and be harmed by the enforcement of the unconstitutional provision. (*Id.,* at p. 188.)

Similarly, in *7978 Corporation* v. *Pitchess* (1974) 41 Cal.App.3d 42 [115 Cal.Rptr. 746], the Court of Appeal reversed an order enjoining enforce-

---

[6]*Ortiz* v. *Woods, supra,* 129 Cal.App.3d 672, cited by appellants, similarly presented no question as to the propriety of the trial court's implicit finding of "interim harm." The Court of Appeal noted that defendant had conceded that "plaintiffs' proof of irreparable injury was irrebuttable and that the trial court's implied factual finding of irreparable harm was correct." (*Id.,* at p. 676.) Thus, the only remaining issue was whether the trial court properly found a likelihood that the plaintiffs would prevail on the merits. Since the question of the constitutionality of certain welfare regulations presented no factual issues, the Court of Appeal found it proper to resolve the merits of the case as though they were before the trial court following the appeal from the ruling on the preliminary injunction. (*Ibid.*)

ment of an ordinance which prohibited public ballroom dancing between 2 a.m. and 6 a.m. The court held that the plaintiffs had "failed to show any pressing injury that would result from delay in obtaining relief . . . ." (*Id.*, at p. 46;[7] accord *City of Santa Monica* v. *Superior Court* (1964) 231 Cal.App.2d 223, 226-227 [41 Cal.Rptr. 824].)

At least one Court of Appeal has adhered to the abuse of discretion review standard where the trial court had *denied* an application for a preliminary injunction by a plaintiff challenging a statute as facially unconstitutional. In *American Booksellers Assn., Inc.* v. *Superior Court* (1982) 129 Cal.App.3d 197 [181 Cal.Rptr. 33], the court found two ordinances regulating the display of certain explicit material unconstitutional on First and Fifth Amendment grounds. The court went on to determine whether the plaintiffs had "demonstrated the type of irreparable injury which would necessitate the issuance of a preliminary injunction." (*Id.*, at p. 206.) The court concluded that the plaintiffs had met their burden in view of the "pervasive chilling effect which the ordinances ha[d] on the exercise of free speech," a harm "not limited to the petitioners before the court." (*Ibid.*) Hence, application of the traditional two-part analysis mandated reversal of the trial court's order denying a preliminary injunction.

■ It is appropriate to follow the *American Booksellers* example in this case. Unlike the parties in the decisions appellant cites, respondents have explicitly urged the propriety of the trial court's implicit finding on the "interim harm" factor as a ground for affirmance. As already noted, the trial court's summary denial of the request for a preliminary injunction could have been based on a finding that appellants failed to satisfy either or both of the two prerequisites for preliminary injunctive relief. Even if the trial court had found for appellants on the "likelihood of success on the merits" factor, it nevertheless could have refused to issue a preliminary injunction if it found that the interim harm to appellants did not outweigh the interim harm to respondents. If this latter implied finding did not constitute an abuse of discretion, the present order must be affirmed.

Here, the Court of Appeal failed to employ the abuse of discretion analysis. Instead, it held that since no material questions of fact were in issue, the merits of appellants' constitutional challenges could be reached in the present appeal. It went on to consider only the preemption issue, finding the escort service ordinance totally preempted by state law.

In view of this disposition, this court addresses only the preemption issue. The case will then be retransferred to the Court of Appeal for an opinion

[7]The Court of Appeal nevertheless addressed the constitutionality of the ordinance since both sides had briefed it and the plaintiffs had requested "declaratory relief on an issue which appears . . . relatively narrow . . . ." (41 Cal.App.3d at p. 46.)

on whether the trial court abused its discretion in implicitly finding for the city on the "interim harm" and "likelihood of prevailing on the merits" factors. Such a disposition is "appropriate to assure that complex and substantial issues raised on appeal are initially considered by the Court of Appeal before their presentation to us, thereby providing the parties a more complete form of appellate review." (*Taylor* v. *Union Pac. R.R. Corp.* (1976) 16 Cal.3d 893, 895 [130 Cal.Rptr. 23, 549 P.2d 855]; see also *Arnel Development Co.* v. *City of Costa Mesa* (1980) 28 Cal.3d 511, 514, 525 [169 Cal.Rptr. 904, 620 P.2d 565]; *Gonzales* v. *Nork* (1978) 20 Cal.3d 500, 511 [143 Cal.Rptr. 240, 573 P.2d 458]; *Vella* v. *Hudgins* (1977) 20 Cal.3d 251, 254 [142 Cal.Rptr. 414, 572 P.2d 28]; cf. *In re Joseph B.* (1983) 34 Cal.3d 952, 960 [196 Cal.Rptr. 348, 671 P.2d 852].)

If it is determined that the trial court abused its discretion on the "interim harm" factor, the only remaining question will be whether the court abused its discretion on the "likelihood of prevailing on the merits" factor. Since appellant's claim constitutes a facial attack on the escort service ordinance and presents only questions of law, the Court of Appeal may then determine the constitutionality of the present ordinance as though the case had proceeded to trial.

## III.

Appellants assert that the escort service ordinance is invalid because it is in "conflict with general laws" in violation of article XI, section 7 of the California Constitution. Pointing to the legislative history and requirements of the ordinance, they contend that it impermissibly seeks to regulate the criminal aspects of sexual conduct, an area of legislation preempted by state law through our Penal Code.

Article XI, section 7 of the state Constitution provides that "[a] county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws."[8] Local legislation in conflict with the general laws is void.

"Conflicts exist if the ordinance duplicates [citations], contradicts [citation], or enters an area fully occupied by general law, either expressly or by legislative implication [citations]. If the subject matter or field of the legislation has been fully occupied by the state, there is no room for supplementary or complementary local legislation, even if the subject [was]

---

[8]Section 7 was added to the state Constitution on June 2, 1970. Prior to that time the pertinent provision was set forth in article XI, section 11. ("Any county, city, town, or township may make and enforce within its limits all such local, police, sanitary and other regulations as are not in conflict with general laws.")

otherwise one properly characterized as a 'municipal affair.' [Citation.]'' (*Lancaster* v. *Municipal Court* (1972) 6 Cal.3d 805, 807-808 [100 Cal.Rptr. 609, 494 P.2d 681]; *In re Hubbard* (1964) 62 Cal.2d 119, 125 [41 Cal.Rptr. 393, 396 P.2d 809], overruled on another point in *Bishop* v. *City of San Jose* (1969) 1 Cal.3d 56, 63 & fn. 6 [81 Cal.Rptr. 465, 460 P.2d 137]; *In re Zorn* (1963) 59 Cal.2d 650, 651 [30 Cal.Rptr. 811, 381 P.2d 635]; *In re Lane* (1962) 58 Cal.2d 99, 102 [22 Cal.Rptr. 857, 372 P.2d 897]; *Abbott* v. *City of Los Angeles* (1960) 53 Cal.2d 674, 681-684 [3 Cal.Rptr. 158, 349 P.2d 974, 82 A.L.R.2d 385].)

The first step in a preemption analysis is to determine whether the local regulation explicitly conflicts with any provision of state law. (See *Galvan* v. *Superior Court* (1969) 70 Cal.2d 851, 855-859 [76 Cal.Rptr. 642, 459 P.2d 930].)

■ The Multipurpose Senior Services Program (Welf. & Inst. Code, § 9400 et seq.), administered by the state Health and Welfare Agency, speaks in terms of regulating "escort services." (Welf. & Inst. Code, § 9403.) This program coordinates and authorizes the delivery of social and health services, including escort services, for "persons 65 years of age and older who are at risk of institutionalization in a skilled nursing facility or intermediate care facility." (Welf. & Inst. Code, §§ 9400, 9403.)[9]

The San Francisco ordinance specifically excludes such escort services from its purview. Its definition of escort services excludes "any businesses, agencies or persons which provide escort services for older persons as defined in [former] California Welfare and Institutions Code Section 9406, when such services are provided as part of a social welfare and health program for such older persons." (§ 1074.1.)[10]

No other provision of state law explicitly regulates the licensing of escort services. Therefore, no preemption on this basis can be found. (See *Galvan* v. *Superior Court, supra,* 70 Cal.2d at pp. 855-859.)[11]

---

[9]A "Pilot Multipurpose Senior Service Projects" program was first put in place in 1977. (Stats. 1977, ch. 1199, § 8, pp. 3986-3989.) That program was modified by amendments effective July 18, 1983. (Stats. 1983, ch. 306, § 1.) It is to be repealed by June 30, 1986 or when a new long-term care delivery system is established, whichever occurs first. (Welf. & Inst. Code, § 9409.) The reference to "escort services" in section 9403 was in existence when the San Francisco ordinance was enacted.

[10]The 1977 version of Welfare and Institutions Code section 9406 defined "older person." That statute was repealed in the 1983 legislation.

[11]*City & County of San Francisco* v. *Boss* (1948) 83 Cal.App.2d 445 [189 P.2d 32], on which appellants rely, is readily distinguishable. There, the constitutionality of an ordinance requiring a contractor's license was at issue. The Court of Appeal found the ordinance in conflict with state law which fully occupied the field. (See Bus. & Prof. Code, § 7000 et seq.; see also *Horwith* v. *City of Fresno* (1946) 74 Cal.App.2d 443 [168 Cal.Rptr. 767] [ordinance regulating electrical contractors held preempted].) Here, no explicit conflict exists since no state statute regulates, through licensing or otherwise, the operation of escort services.

■ The next question is whether any provision of the local regulation duplicates state law.[12]

At least two provisions of the present ordinance suffer from that defect. Section 1074.22, subdivision (A) prohibits an individual "while acting as an escort in an escort service [from] engag[ing] in any type of criminal conduct with a customer of an escort service." This provision unquestionably duplicates state criminal law insofar as it applies to "escorts." To that extent, the ordinance is preempted. (*Lancaster* v. *Municipal Court, supra,* 6 Cal.3d at pp. 807-808; *Abbott* v. *City of Los Angeles, supra,* 53 Cal.2d at p. 682; *Chavez* v. *Sargent* (1959) 52 Cal.2d 162, 176 [339 P.2d 801]; *In re Portnoy* (1942) 21 Cal.2d 237, 240 [131 P.2d 1]; *Pipoly* v. *Benson* (1942) 20 Cal.2d 366, 370 [125 P.2d 482, 147 A.L.R. 515].)

Section 1074.23 provides that no person "shall permit, counsel or assist any other person in the violation of [the ordinance]." To the extent this provision is an attempt to proscribe the aiding and abetting of a state criminal offense—an interpretation which readily obtains by reading this section and section 1074.22, subdivision (A) together—it, too, duplicates state law and is preempted. (See Pen. Code, § 31; *Lancaster* v. *Municipal Court, supra,* 6 Cal.3d at pp. 807-808.)

■ The ordinance expressly provides for severability in the event any provision is held unconstitutional. (§ 1074.30.) The above invalid provisions are easily severable from the remainder of the ordinance, which deals primarily with the licensing of escort services. Consequently, the unconstitutional provisions do not taint these latter provisions, whose validity must be separately determined. (*City and County of San Francisco* v. *Cooper* (1975) 13 Cal.3d 898, 930 [120 Cal.Rptr. 707, 534 P.2d 403].)

Since these latter provisions neither expressly contradict nor duplicate state law, their validity must be evaluated under implied preemption principles. ■ "In determining whether the Legislature has preempted by implication to the exclusion of local regulation we must look to the whole purpose and scope of the legislative scheme. There are three tests: '(1) the subject matter has been so fully and completely covered by general law as to clearly indicate that it has become exclusively a matter of state concern;

---

[12]"The reason that a conflict [with the 'general laws' under article XI, section 7 of the state Constitution] is said to exist where an ordinance duplicates state law is that a conviction under the ordinance will operate to bar prosecution under state law for the same offense. [Citation.] Where 'the prosecution is or should be aware of more than one offense in which the same act or course of conduct plays a significant part, all such offenses must be prosecuted in a single proceeding unless joinder is prohibited or severance permitted for good cause.' [Citation.]" (*People* v. *Orozco* (1968) 266 Cal.App.2d 507, 511, fn. 1 [72 Cal.Rptr. 452, 32 A.L.R.3d 1429].)

(2) the subject matter has been partially covered by general law couched in such terms as to indicate clearly that a paramount state concern will not tolerate further or additional local action; or (3) the subject matter has been partially covered by general law, and the subject is of such a nature that the adverse effect of a local ordinance on the transient citizens of the state outweighs the possible benefit to the municipality.' " (*People* ex rel. *Deukmejian* v. *County of Mendocino* (1984) 36 Cal.3d 476, 485 [204 Cal.Rptr. 897, 683 P.2d 1150], quoting *In re Hubbard, supra,* 62 Cal.2d at p. 128; accord *Galvan* v. *Superior Court, supra,* 70 Cal.2d at pp. 859-860.)

Appellants' chief claim is that the ordinance[13] is in substance a criminal statute enacted to curb the commission of sex-related offenses—most notably prostitution (Pen. Code, § 647, subd. (b))—which are often associated with escort service activities. They argue that criminal and sexual activity are fully regulated by state law, either exclusively or partially, and no additional regulation by a municipality can be tolerated.

If the ordinance were in substance a criminal statute which attempted to prohibit conduct proscribed or permitted by state law either explicitly or implicitly, it would be preempted. In *In re Lane, supra,* 58 Cal.2d 99, for example, this court invalidated an ordinance which made it a crime for persons not married to each other to resort to numerous specified places for the purpose of engaging in sexual intercourse or participating in a lewd act. (*Id.,* at p. 102.) The court noted that certain types of sexual activity had been proscribed by the Penal Code, but that "neither simple fornication nor adultery alone nor living in a state of cohabitation and fornication has been made a crime in this state." (*Id.,* at p. 104.) The omission of these activities from state law could reasonably be construed to indicate a legislative intent to permit them, thereby preventing municipalities from rendering them criminal. (*Id.,* at pp. 104-105.)

Similarly, in *Lancaster* v. *Municipal Court, supra,* 6 Cal.3d 805, this court invalidated a Los Angeles ordinance which made it a misdemeanor for individuals in connection with their businesses to provide massages to members of the opposite sex. The court observed that "[t]here has been no suggestion of any reasonable purpose to the ordinance before us other than to limit sexual activity. Although it has been urged that the ordinance should be viewed as a regulation of the business of administering massages and not a sexual regulation, the only specification of any actual or potential evil is the sexual activity which may follow in the wake of the massage." (*Id.,* at p. 809.)

---

[13]Subsequent references to the escort service ordinance are to the unsevered provisions.

Pointing to the comments of city officials that the purpose of the ordinance was " 'to regulate a source of licentiousness,' " the court concluded that "[t]his admission clearly indicates that the purpose of the ordinance in question was not to regulate the operation of massage parlors but was aimed at making the task of the police department and sheriff's office easier in their fight against prostitution and lewd conduct. We are satisfied that the ordinance is a regulation of the criminal aspects of sexual conduct." (*Ibid.*, fn. omitted.) In view of "[t]he constant attention the Legislature has given to the criminal aspects of sexual activity," the court held that "in the absence of an express statutory provision to the contrary, this area of the law is intended to be wholly within the control of the Legislature and not subject to local regulation." (*Id.*, at p. 808.)[14]

In many subject areas related to state law, the Legislature has specifically authorized local legislation. Massage parlor regulations are illustrative. In 1976, "recogniz[ing] the existing power of a city or county to regulate a lawful massage business," the Legislature permitted local schemes "which provide[] for the licensing for regulation of the business of massage . . . ." (Gov. Code, §§ 51034, 51030.) Although the Legislature suggested certain standards for municipalities to follow in enacting such regulations, it was careful to note that nothing in the legislation should be construed as "a

---

[14]*Gates* v. *Municipal Court* (1982) 135 Cal.App.3d 309 [185 Cal.Rptr. 330] and *Spitcauer* v. *County of Los Angeles* (1964) 227 Cal.App.2d 376 [38 Cal.Rptr. 710] provide additional examples of local criminal regulations held preempted by state law. The ordinance in *Gates* proscribed loitering in any public place "for the purpose of soliciting an act of prostitution or lewdness . . . ." (*Id.*, at p. 312, fn. 1.) Since the ordinance had "no other purpose than the regulation of sexual conduct and . . . merely attempt[ed] to create a new form of sexual crime akin to and yet different from, and vaguer, than criminal attempt" (*id.*, at p. 320), it could not be sustained.

Similarly, in *Spitcauer,* the ordinance prohibited the operation of "studios" wherein models would pose for the purpose of being depicted " 'in the nude or semi-nude by persons who pay a fee, or other consideration . . . for the right [to do so].' " (227 Cal.App.2d at p. 378.) The court held that it was "manifest that the ordinance is invalid as an admitted attempt to provide an additional proscription in the area of criminal sexual activities," a field "very definitely . . . preempted entirely by the state." (*Ibid.*)

On the other hand, there are numerous local criminal regulations which have withstood preemption claims that they impermissibly sought to curb activities associated with conduct made criminal under state law. Examples include ordinances which prohibit nudity on public beaches and in public areas (*Eckl* v. *Davis, supra,* 51 Cal.App.3d 831), loitering in tunnels, pedestrian subways or general freeway areas (*Gleason* v. *Municipal Court* (1964) 226 Cal.App.2d 584 [38 Cal.Rptr. 226]), glue sniffing (*People* v. *Orozco, supra,* 266 Cal.App.2d 507), consumption of alcoholic beverages on streets and playgrounds (*People* v. *Butler* (1967) 252 Cal.App.2d Supp. 1053 [59 Cal.Rptr. 924]), trespassing on school grounds (*In re Rudolfo A.* (1980) 110 Cal.App.3d 845 [168 Cal.Rptr. 338]), loitering while carrying a concealed weapon (*Yuen* v. *Municipal Court* (1975) 52 Cal.App.3d 351 [125 Cal.Rptr. 87]), and entry by unaccompanied minors into places of business which display and sell narcotics paraphernalia (*Music Plus Four, Inc.* v. *Barnet* (1980) 114 Cal.App.3d 113 [170 Cal.Rptr. 419]).

limitation on th[e] existing power [to so regulate] or on the existing authority of a city to license for revenue purposes . . . ." (Gov. Code, § 51034.)[15]

The Courts of Appeal have since deferred to local regulation in this area. For example, in *Brix* v. *City of San Rafael* (1979) 92 Cal.App.3d 47 [154 Cal.Rptr. 647], the court rejected a preemption attack on a licensing ordinance which regulated the hours of operation and the activity conducted within massage parlors. The court noted that "[t]he purpose and effect of such requirements is to discourage massage establishments from degenerating into houses of prostitution. This is a valid exercise of the city's power to regulate the health, morals and welfare of the community; and the means used bears a rational relationship to the goals sought to be achieved. [Citation.]" (*Id.*, at p. 54; accord *Owens* v. *City of Signal Hill* (1984) 154 Cal.App.3d 123 [201 Cal.Rptr. 70].)

Similarly, in Penal Code sections 318.5 and 318.6 the Legislature has recognized the power of local governments to regulate the public exposure of private bodily parts by waiters, waitresses or entertainers in eating and drinking establishments and other public places. While the courts have scrutinized ordinances regulating such activity on First Amendment grounds (see, e.g., *Morris* v. *Municipal Court* (1982) 32 Cal.3d 553 [186 Cal.Rptr. 494, 652 P.2d 51], overruling *Crownover* v. *Musick* (1973) 9 Cal.3d 405 [107 Cal.Rptr. 681, 509 P.2d 497]), they have not disturbed the grant of municipal power which those statutes recognize.

No provision of state law explicitly permits municipal regulation of escort services. However, that fact does not necessitate a finding of preemption. The test is whether state law is so formulated as to indicate an intent to preclude local regulation, i.e., whether state law fully or partially covers the subject matter of the ordinance such that no local regulation can be tolerated. (*In re Hubbard, supra,* 62 Cal.2d at p. 128.)

The present ordinance is not preempted under this test. State law does not implicitly or explicitly prohibit or permit conduct regulated by the ordinance. The ordinance does not prohibit sexual or criminal activity or impose a sanction for engaging in it. It prohibits escort services and escorts from operating without permits, whether or not the escorts provide sexual favors in return for money. The law regulates the business of escort services, not their nature.

---

[15]The legislation also provided that nothing should "authorize a city, county, or city and county to prohibit a person of one sex from engaging in the massage of a person of the other sex." (Gov. Code, § 51034.) This provision was an apparent recognition of the vitality of the *Lancaster* holding. (See *ante,* at pp. 293-294.)

By contrast, the state prostitution statute, like other state statutes which describe criminal conduct, does not deal with the business of escort services. Instead, it proscribes particular acts which may or may not occur while escort services are being provided to a patron. In contrast to the ordinance's requirement that an escort obtain a permit to accompany others for money to "social affairs, entertainments, places of amusement or public resort, or private quarters" (§ 1074.1), the prostitution statute deals with the particular act of soliciting for money lewd conduct in *any* setting. The ordinance prohibits only the operation of a business without a permit.

San Francisco's right to utilize its licensing power as a means to regulate businesses conducted within its borders can scarcely be disputed. "The requirement that a license first be obtained before conducting a business or activity has long been recognized as a valid exercise of the police power." (*Sunset Amusement Co.* v. *Board of Police Commissioners* (1972) 7 Cal.3d 64, 72 [101 Cal.Rptr. 768, 496 P.2d 840].) This principle is embodied in Business and Professions Code section 16000: "The legislative bodies of incorporated cities may, in the exercise of their police power, and for the purpose of regulation, as herein provided, and not otherwise, license any kind of business not prohibited by law transacted and carried on within the limits of their jurisdictions, . . . and may fix the rates of such license fee . . . ."[16] (See also Gov. Code, § 37101 ["The [local] legislative body may license, for revenue and regulation, and fix the license tax upon, every kind of lawful business transacted in the city . . ."].)

Significantly, even the *Lancaster* court recognized the validity of local licensing regulation in areas related to conduct covered by state law. That court cited with approval the Court of Appeal decision in *Robins* v. *County of Los Angeles* (1966) 248 Cal.App.2d 1 [56 Cal.Rptr. 853], which had rejected a preemption attack on an ordinance requiring a license fee for establishments employing topless waitresses. In distinguishing that ordinance from the massage parlor ordinance before the court, Justice Peters noted, "[t]he fact that the criminal aspects of sexual activity have been preempted by the state does not mean that counties may not collect license fees for the right to engage in lawful activities relating to sex." (*Lancaster, supra,* 6 Cal.3d at p. 809.)

 This reasoning is applicable here. An escort service may very well involve "lawful activities relating to sex." No provision of state law explicitly or implicitly limits the ability of a municipality to regulate through its licensing power the operation of such businesses.

---

[16]A similarly worded provision recognizes the licensing power of counties. (Bus. & Prof. Code, § 16100.)

Indeed, one Court of Appeal has so concluded. In *People* v. *Katrinak* (1982) 136 Cal.App.3d 145 [185 Cal.Rptr. 869], the court considered whether a Los Angeles County "escort bureau" licensing ordinance was in conflict with state law regulating sexual conduct. Relying on the *Lancaster* court's distinction between criminal statutes and licensing ordinances, the Court of Appeal held the ordinance was "a licensing scheme for a lawful business enterprise" and was not preempted. (*Katrinak, supra,* 136 Cal.App.3d at pp. 154-155, fn. 9.)

The *Katrinak* court's conclusion appears correct. Unlike the ordinance in *Lancaster,* which made bodily contact between members of the opposite sex criminal, the present ordinance does not proscribe conduct between individuals. Rather, it only requires a permit by escort service operators and escorts and the disclosure of information by customers.

Moreover, even assuming that the majority of escort services are, as the board of supervisors was told, only a front for individuals engaged in sex-related criminal activity,[17] this fact does not render the city powerless to license such services. A few cases illustrate this point.

Consider *Harriman* v. *City of Beverly Hills* (1969) 275 Cal.App.2d 918 [80 Cal.Rptr. 426, 35 A.L.R.3d 1421]. There, the court upheld the constitutionality of an ordinance requiring a police permit to advertise or operate a telephone answering service. Testimony before the city council revealed that individuals employed by such services were often privy to confidential information such as the comings and goings of subscribers and knowledge of their personal affairs. In enacting the ordinance, the council found it necessary to " 'protect[] the well-being of its citizenry from the hazards of a potentially harmful enterprise,' " even though the operation of the service itself involved " 'nothing inherently objectionable . . . .' " (*Id.,* at p. 921.) The Court of Appeal affirmed the trial court's refusal to enjoin enforcement of the ordinance, endorsing the trial judge's finding that there were " 'inherent dangers in that [the service] could be used for illegal purposes or to facilitate immoral activities." (*Id.,* at pp. 921-922.)

Even closer to home is *EWAP, Inc.* v. *City of Los Angeles, supra,* 97 Cal.App.3d 179. There, the court considered a municipal ordinance requir-

---

[17]The board heard from three individuals regarding the proposed ordinance. Chief of Police Cornelius Murphy and Mayor Dianne Feinstein submitted letters to the board urging approval of the law. Captain Diarmuid Philpott, head of the vice crimes division of the city's police department, testified before the board's finance committee. All three stated that escort services often serve as a front for serious criminal activity, including prostitution, theft, assault and battery. Chief Murphy and Captain Philpott emphasized that the ordinance would aid in the investigation and prosecution of such activities and would eventually reduce the need for police services, since "illegal types of escort services will be greatly reduced."

ing a permit to operate a picture arcade and prohibiting concealed or partially enclosed picture booths. The Court of Appeal found that the purpose of the ordinance was not the regulation of lewd conduct under the Penal Code, which would clearly have been preempted, but rather "to regulate the operation of picture arcades so that their operation does not invite or encourage violations of state law. Thus, the provision no more constitutes a regulation of sexual activity than does an ordinance requiring full lighting of streets." (*Id.*, at p. 191.)

Dicta in *In re Holmes* (1921) 187 Cal. 640 [203 P. 398] is consistent with these examples. There, the court sustained the conviction of a second-hand bookseller who had failed to comply with a San Francisco ordinance requiring dealers in second-hand merchandise to secure a permit before engaging in business. Rejecting Holmes's claim that regulation of such business was beyond the reach of the police power, the court noted that "[s]econd-hand goods, wares, and merchandise have always been deemed the proper subjects of police regulation by municipalities . . . and the grant by the constitution . . . to municipalities 'to make and enforce all such local, police, sanitary and other regulations as are not in conflict with general laws,' is very broad and liberal. . . . [S]econd-hand personal property which, being movable, valuable, and passing easily from hand to hand, are often made the subject of purloining and petit larceny and of disposal in second-hand places of business. Such places of business have, therefore, been made the proper subjects of police inspection and regulation." (*Id.*, at p. 645; see also *Gospel Army* v. *City of Los Angeles* (1945) 27 Cal.2d 232 [163 P.2d 704] [upholding a local ordinance requiring licensing of second-hand dealers against claim that it violated free religious exercise clause of the First Amendment, noting that the regulation was "designed to protect the public interest by preventing such dealers from becoming outlets for stolen goods." (*Id.*, at p. 236.)].)

These cases recognize the legitimate need of local government to address problems generated by business involvement in activities that may be inimical to the health, safety and welfare of the community. Obviously, every municipality is unique. "The state in its law deals with all of its territory and all of its people. The exactions which it prescribes operate . . . upon the people of the state, urban and rural, but it may often, and does often happen that the requirements which the state sees fit to impose may not be adequate to meet the demands of densely populated municipalities; so that it becomes proper and even necessary for municipalities to add to state regulations provisions adapted to their special requirements." (*In re Hoffman* (1909) 155 Cal. 114, 118 [99 P. 517].)

For this reason, a local governmental body may properly determine that a particular business fosters, profits from and provides an environment

for activities proscribed by state law. An ordinance is not transformed into a statute prohibiting crime simply because the city uses its licensing power to discourage illegitimate activities associated with certain businesses. Most licensing ordinances have a direct impact on the enforcement of state laws which have been enacted to preserve the health, safety and welfare of state and local citizens. This fact does not deprive a municipality of the power to enact them.

In addition, an ordinance is not preempted simply because it seeks to alleviate the burden that local enforcement of state law imposes on police and other city officials. (See *ante,* fn. 17.) That objective is a sound basis for local legislation. (See, e.g., *Miller* v. *Murphy* (1983) 143 Cal.App.3d 337, 342 [191 Cal.Rptr. 740] [San Francisco ordinance requiring state-licensed pawnbrokers to verify transactions by taking customer's fingerprints and requiring photographic or other identification held valid addition to state requirements, since "[t]he . . . regulations merely add to those minimum requirements as a means to further aid the detection of crimes of theft, and cannot be said to have surpassed local authority to regulate"]; *People* v. *Butler, supra,* 252 Cal.App.2d Supp. at p. 1055 [rejecting preemption attack on ordinance prohibiting consumption of intoxicating beverages in public places, noting that such conduct "could well constitute a . . . police problem, particularly when we consider such a public gathering place as a mall where large numbers of the people congregate into the evening"]; cf. *Sunset Amusement Co.* v. *Board of Police Commissioners, supra,* 7 Cal.3d at p. 70, fn. 1 [upholding the denial of a business license for the operation of a local roller skating rink, noting as one of the reasons for the denial that "the operation of the premises has required numerous man-hours and police efforts to prevent and control major disturbances."].)

■ It is true that the present ordinance requires disclosure of information which will no doubt aid police in investigating criminal activity, especially in the area of prostitution and other sex-related conduct that may arise in connection with the operation of such services. In addition, the granting of an escort service permit is dependent upon the absence of convictions for sexual offenses. While these aspects of the ordinance may raise other constitutional questions—an issue which this court does not resolve at this time—they afford no basis for preemption. It is significant that the ordinances upheld in *Gospel Army* and *Harriman* contained similar disclosure and disqualification provisions, yet were not held unconstitutional on preemption grounds. (See also *Miller* v. *Murphy, supra,* 143 Cal.App.3d at p. 342.)

For these reasons, it cannot be said that San Francisco's escort service ordinance involves a subject that is either completely or partially covered

by state law. (See *ante,* at p. 293; *In re Hubbard, supra,* 62 Cal.2d at p. 128.)

 Even assuming, however, that the subject matter were partially covered by state law, preemption would not be found under the second or third *Hubbard* tests. Under the second test, the "paramount state concern" will clearly tolerate local regulation in this area. The legislative history of the ordinance, scant as it is, clearly shows that there are " 'substantial, geographic, economic, . . . or other distinctions [which] are persuasive of the need for local control' " of escort services (*Galvan* v. *Superior Court, supra,* 70 Cal.2d at pp. 863-864).

Under the third *Hubbard* test, it is clear that the subject is not "of such a nature that the adverse effect of a local ordinance on the transient citizens of the state outweighs the possible benefit to the municipality." (62 Cal.2d at p. 128.) The legislative history also provides some guidance on this question. As Chief Murphy's letter of May 21, 1981, to the mayor reveals, there have been several instances where escort service employees have committed thefts against tourists. Thus, the ordinance may very well have a positive impact on the "transient citizens of the state" since it provides a means for identifying suspects in the event criminal activity is alleged to have occurred while escort services were being provided. Moreover, any negative impact occasioned by the period of time necessary to secure an escort service permit before engaging in the business is shared by transients and residents of the city alike.

Appellants' final preemption argument, advanced only in summary fashion, is that the ordinance is preempted because it attempts to regulate employment agencies and the practice of law, both of which are matters exclusively of state concern. (Bus. & Prof. Code, § 9900 et seq. [employment agencies]; § 6000 et seq. [attorneys].) This contention lacks merit.

The Employment Agency Act (Act) is contained in Business and Professions Code section 9900 et seq. The Act requires an employment agency to procure a license from the Bureau of Personnel Services, which is under the jurisdiction of the Department of Consumer Affairs. (Bus. & Prof. Code, §§ 9920, 9940.)

An employment agency is defined in pertinent part as (1) a business "which procures, offers, promises, or attempts to procure employment or engagements for others or employees for employers," or which "provid[es] employment or engagements where a fee or other valuable consideration is exacted," or (2) "[a]ny person, service, bureau, organization, club, resumé service, or employment counseling service, which . . . offers, as one of its

main objects or purposes, to procure employment for any person who will pay for its services, . . . where the main object of the person paying . . . is to secure employment." (Bus. & Prof. Code, § 9902, subds. (a) & (b).) Labor contractors and employment counseling services also qualify as employment agencies under the Act. (*Id.*, at subds. (c) & (d).)[18]

The function of an employment agency is to put prospective employees in touch with prospective employers, and vice-versa. The agency's goal is to foster an employment relationship where the employer will compensate the employee on a continuing basis for services rendered. That cannot reasonably be said to be the purpose of an escort service, nor can its definition be so construed.

There are three possible arguments as to why an escort service qualifies as an "employment agency" under the Act. First, an escort service "patron" is an "employer" for whom the service procures or attempts to procure "employees." (Bus. & Prof. Code, § 9902, subd. (a).)

Presumably, in seeking an escort, the patron is not seeking to establish an employment relationship. The fact that an escort might frequently be called upon to perform escort services for a particular patron does not transform the service into an employment agency any more than a law firm or medical group is transformed into an employment agency when a satisfied customer utilizes the services of a particular practitioner over an extended period.

The second argument is that an escort service is an employment agency by virtue of its status as a "labor contractor." While this argument may have technical merit, it by no means compels a finding of preemption.

The Act defines a "labor contractor" as "any person, who, for a fee or other compensation, employs an individual to render personal services to, for, or under the direction of, a third person." (Bus. & Prof. Code, § 9902, subd. (c)(1).) However, such a person who, "in addition to wages or salaries, pays federal social security taxes, state and federal unemployment insurance, carries workers' compensation insurance . . . and sustains responsibility for the acts of his or her employees while rendering services to, for, or under the direction of, a third person" is excepted from this definition. (*Id.*, subd. (c)(4).)

---

[18]The first legislation regulating private employment agencies was enacted in 1913. (Stats. 1913, ch. 282, § 1 et seq., pp. 515-521.) The definition of "employment agency" was enacted as part of that legislation. (*Id.*, at p. 515.) Although the definition has been amended several times, it has retained much of the original language.

Escorts are usually employed "to render personal services to, for, or under the direction of," patrons of the service. Therefore, it is possible that an escort service operator would qualify as a "labor contractor" under the definition in subdivision (c)(1).

Since this appeal arises from the denial of a preliminary injunction, the present record contains no evidence as to how the compensation schemes of most escort services are structured. It is possible that some services (1) permit compensation directly by the patron to the escort, (2) extract a fee for having arranged a particular outing, and (3) provide none of the amenities noted in the exception quoted above. Under those circumstances, such a service may technically constitute an employment agency under the Act.[19]

■ Even assuming an escort service would be considered an employment agency within the Act, the present ordinance would not necessarily be preempted. *Hubbard* teaches that implied preemption will be found where the subject matter has been partially or fully covered by state law as to leave no room for local regulation. (*In re Hubbard, supra,* 62 Cal.2d at p. 128.) Clearly that is not the case here. The limited purpose of the Employment Agency Act is, in all likelihood, to protect job seekers and prospective employers. The escort service ordinance, on the other hand, seeks to regulate businesses some of which have been associated with criminal conduct. The state's interest in ensuring legitimate employment agency practices accommodates fully this distinct local concern. Therefore, the ordinance is not in conflict with state law.

■ Appellants' additional contention is that the escort service ordinance impermissibly regulates the practice of law. Appellants' argument, made in conjunction with their overbreadth and vagueness challenges, is that the ordinance can reasonably be construed to apply to attorneys who engage in the practice of law. This claim is without merit. As a result, the preemption argument on this point must likewise fail.

---

[19]The third argument is that an escort service is an employment agency by virtue of the fact that it procures or attempts to procure "engagements" for "others." (Bus. & Prof. Code, § 9902, subd. (a).) This argument requires the court to determine whether the term "engagements" may reasonably encompass the arrangements that escort services provide for escorts and escort service patrons.

The only escort services affected by such an interpretation would be those which, because of the exemption in Business and Professions Code section 9902, subdivision (c)(4), do not come within the more particular definition of "labor contractors" in subdivision (c)(1). It would be anomalous to hold that such services, having satisfied the detailed set of requirements in subdivision (c)(4) to qualify for exemption from the Act's coverage, are nevertheless included under subdivision (a). For this reason, an escort service cannot reasonably be said to be in the business of procuring or attempting to procure "engagements" for "others."

It is well established that local governments may not regulate the practice of law, since such activity is purely a matter of state concern under the State Bar Act. (Bus. & Prof. Code, § 6000 et seq.) In *Baron* v. *City of Los Angeles* (1970) 2 Cal.3d 535 [86 Cal.Rptr. 673, 469 P.2d 353, 42 A.L.R.3d 1036], this court reviewed the constitutionality of an ordinance requiring the registration of "municipal legislative advocates." An advocate was defined as any person who was hired " 'for the purpose of attempting to influence the action on municipal legislation . . . .' " (*Id.*, at p. 537.) Baron was an attorney who represented clients before local administrative agencies. Many of his activities were confined to the practice of law and did not take the form of lobbying. He claimed that the ordinance could not be enforced since it interfered with the state's exclusive right to regulate the practice of law.

This court held the ordinance was preempted to the extent that it regulated the practice of law before local governmental agencies. The court was careful to note that the State Bar Act regulates attorneys "only insofar as they are 'practicing law' under the act—i.e., performing services in a representative capacity in a manner which would constitute the unauthorized practice of law if performed by a layman." (*Id.*, at p. 543.) Such practice includes " ' "legal advice and counsel and the preparation of legal instruments and contracts by which legal rights are secured," ' " as well as "the resolution of legal questions" which " 'reasonably demand the application of a trained legal mind.' " (*Id.*, at pp. 542, 543.)

No provision of the escort service ordinance explicitly or implicitly regulates the practice of law. An "escort" is defined as any person who, for money or other consideration, may "accompan[y] [or] consort[] with others about any place of public resort or within any private quarters." (§ 1074.1, subd. (b).) Even a broad reading of that definition cannot reasonably be said to include attorneys engaged in the practice of law.

It is no doubt quite common for a lawyer during the course of the lawyer-client relationship to "accompany" a client to a "place of public resort" such as a restaurant or social club. The client may also pay the lawyer for his or her time during such an outing, as well as the expenses of the meeting. However, even in such circumstances, it is rare that the lawyer is paid for providing the client with social company. Rather, it is far more likely that he or she is paid for providing legal advice during the meeting. The rendering of legal services which may involve an occasional social meeting in a public place does not transform the attorney-client relationship into one of "escort" and "patron" as those terms are used in the ordinance.

The same reasoning applies even if the "accompanying" or "consorting" takes place "within any private quarters" such as the lawyer's office or the

client's place of business. The reason for such a meeting is usually to enable the attorney to provide legal advice. The attorney is paid for performing that service rather than for socializing with the client. It is doubtful that most lawyers accept legal fees solely for socializing with a client or without performing services in a representative capacity, giving legal advice and counsel, or resolving legal questions which reasonably demand the application of a trained legal mind. (*Baron* v. *City of Los Angeles, supra,* 2 Cal.3d at pp. 542, 543.)[20]

## IV.

San Francisco's escort service ordinance is preempted by state law to the extent it prohibits escorts from engaging in criminal conduct (§ 1074.22, subd. (A)) or from aiding and abetting such conduct (§ 1074.23). In all other respects, the ordinance is not in conflict with the general laws of this state.

Since it is appropriate that the Court of Appeal first determine whether, on the remaining issues, the trial court abused its discretion in denying appellants' application for a preliminary injunction, the cause is retransferred to the Court of Appeal, First Appellate District, Division Two. (*Taylor* v. *Union Pac. R.R. Corp., supra,* 16 Cal.3d at p. 895; see *ante,* at p. 290.) Each side shall bear its own costs in this portion of the appeal.

Broussard, J., Reynoso, J., Lucas, J., Kaus, J.,* and Lewis, J.,† concurred.

**MOSK, J.,** Concurring and Dissenting.—I concur generally in the majority opinion, but I dissent from its order of retransfer to the Court of Appeal.

While it might have been preferable to have all the issues ventilated in the prior proceedings in the Court of Appeal, the entire matter is before us now. In the interest of judicial economy, and to spare the litigants unnecessary time and expense, we should render a definitive judgment and thus finally terminate this case.

The ordinance was adopted in 1981 and this lawsuit was filed in the same year. After four years the parties are entitled to a final judgment rather than

---

[20]If it were established that a lawyer were not engaged in the practice of law but rather in the conduct described in the ordinance, he or she, like any individual, would be required to comply with the permit requirement, assuming it passes muster under appellants' other claims.

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

†Assigned by the Chairperson of the Judicial Council.

a mere temporizing order that will require additional proceedings in the Court of Appeal and perhaps another petition for review in this court.

Appellants' petition for a rehearing was denied November 27, 1985. Grodin, J., did not participate therein.