Filed 8/10/15  St. Agnes Med. Center v. Santé Community Physicians IPA Med. Group CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| SAINT AGNES MEDICAL CENTER et al.,<br><br>Plaintiffs and Appellants,<br><br>v.<br><br>SANTÉ COMMUNITY PHYSICIANS IPA MEDICAL GROUP,<br><br>Defendant and Respondent. | F069510<br><br>(Super. Ct. No. 13CECG03308)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  M. Bruce Smith, Judge.

Manatt, Phelps & Phillips, John F. Libby, Jeffrey L. Maurer and Joanna S. McCallum for Plaintiff and Appellant Saint Agnes Medical Center.

Lang, Richert & Patch and Scott J. Ivy for Plaintiff and Appellant First Choice Medical Group.

Peckar & Abramson, Nicholas W. Sarris and Christopher S. Frederick for Defendant and Respondent.

-ooOoo-

First Choice Medical Group, LLC (First Choice) and Saint Agnes Medical Center (SAMC) (together plaintiffs) appeal from the trial court's order denying their motion for a preliminary injunction against defendant Santé Community Physicians IPA Medical Corporation (Santé). Plaintiffs asserted that Santé was engaging in unfair business practices in violation of Business and Professions Code[1] section 17200 et seq. (the Unfair Competition Law or the UCL), including allegedly sending threatening notices and ultimatums to primary care physicians in the Fresno area to dissuade them from contracting with First Choice. Plaintiffs' motion sought interim injunctive relief to prohibit Santé from engaging in such conduct pending the trial on the merits. In weighing the evidence submitted by the parties in connection with the motion, the trial court concluded that plaintiffs failed to show a substantial likelihood of success on the merits. Additionally, the trial court found that damages would constitute an adequate remedy. For these reasons, the trial court denied plaintiffs' request for a preliminary injunction. Plaintiffs appeal from that order. We conclude from our review of the record that the trial court's denial of preliminary injunctive relief was within its broad discretion. Accordingly, the trial court's order is affirmed.

## FACTS AND PROCEDURAL HISTORY

Key Terms and Structures

We begin by noting the terminology used in our discussion to describe some of the basic relationships in the health care insurance system. Insurance companies such as Blue Shield, Aetna, Anthem Blue Cross, Health Net, and others, offer health maintenance organization (HMO) plans for health insurance coverage to consumers in the Fresno area. With this type of coverage, most medical services are provided by or coordinated through a member's primary care physician who is normally part of a physicians' association or

---

[1]     Unless otherwise indicated, all further statutory references are to the Business and Professions Code.

2.

group under contract with the HMO. (See, e.g., *Zembsch v. Superior Court* (2006) 146 Cal.App.4th 153, 157.) We refer to such plans in a generic way as simply HMO's or HMO plans, unless there is need to mention a particular company by name. We refer to the persons insured under such plans as the HMO members.

An independent practice association (or IPA) is an association of physicians in a geographic area. A physician joins an IPA by signing a contract with that IPA. As a distinct legal entity, an IPA negotiates and enters into contracts with HMO's to provide medical care to HMO members through the IPA's contracted physicians. (See, e.g., Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2014) ¶ 6:907.)[2] HMO's using the IPA model will contract with an IPA to secure access to the IPA's panel of primary care physicians and specialists for the HMO members. As described in the case law, an IPA is "an association of physicians that contracts to provide medical care to HMO members in the physicians' own offices. The IPA in turn contracts with each of its independent practitioner members regarding the terms of participation in the IPA, including payment." (*Inland Empire Health Plan v. Superior Court* (2003) 108 Cal.App.4th 588, 590; see *Heritage Provider Network, Inc. v. Superior Court* (2008) 158 Cal.App.4th 1146, 1149, fn. 2.)

Santé, as an IPA, has negotiated contracts with several HMO's in the Fresno area. According to Chris Cheney, Santé's Chief Financial Officer and Chief Operations Officer, such agreements typically work in the following manner: The physicians affiliated with Santé provide medical care to the HMO members; the HMO compensates Santé in a fixed amount each month (generally on a fee-per-member-per-month basis known as "capitation") and Santé, in turn, compensates its physicians based on the terms

---

**2** Other types of HMO's use a different model in which the HMO directly employs the physicians and staff and often owns its health care facilities. (Croskey et al, Cal. Practice Guide: Insurance Litigation, *supra*, ¶ 6:906.) In this case, the HMO's described follow the IPA model by signing contracts with IPA's or physicians groups.

of its individual agreements with said physicians. The primary care physicians who contract with Santé agree "to provide Primary Care Services to Enrollees of each and every Plan with which [Santé] IPA has contracted who have selected [the physician] as their Primary Care Physician." The primary care physicians who contract with Santé are paid by Santé either on a fee-for-service basis or, alternatively, on a monthly capitation basis that is calculated based on the number of HMO patients assigned to that primary care physician.

An HMO member ordinarily selects his or her primary care physician under an HMO plan. In some instances, an HMO may select a primary care physician for a member on the member's behalf. However, an IPA (such as Santé) has no ability to make or change the assignment of an HMO member to a primary care physician. A primary care physician in an HMO plan acts not only as the HMO member's main point of contact for his or her medical care, but is also the gatekeeper responsible for managing such medical care, including referrals to specialists and making arrangements for hospital care.

With this conceptual framework in view, we now turn to plaintiffs' allegations of unfair business practices.

Plaintiffs' Allegations of Unfair Business Practices

The operative pleading at the time of the motion for preliminary injunction was the first amended complaint (the complaint), filed by plaintiffs on January 21, 2014. The complaint included damage causes of action, including intentional interference with contract, intentional interference with prospective economic advantage and negligent interference with prospective economic advantage.[3] Additionally, the complaint sought

---

[3] We note that on May 13, 2014, one day before the hearing on the motion for preliminary injunction, Santé's general demurrer was sustained as to the intentional interference with contract causes of action only with leave to amend. A second amended complaint was filed and a subsequent demurrer was filed by Santé, which was largely overruled on August 5, 2014.

4.

injunctive relief against Santé for violation of section 17200 et seq., premised on alleged unlawful, unfair or fraudulent business practices carried out by Santé to squelch competition in the Fresno area.

According to the allegations in the complaint, Santé is the largest IPA in the Fresno area and dominates the HMO market there. All of the major health plans operating in the Fresno area have contracts with Santé in order to "provide those health plans with access to a panel of primary care physicians that their HMO members can select, and specialists that their HMO members can access when their members' primary care physicians recommend it." However, Santé currently requires all of its contracted physicians to refer HMO members who need nonemergency hospital care to Community Medical Centers (which is comprised of Clovis Community Medical Center, Community Regional Medical Center, and Fresno Heart & Surgical Hospital). This means that SAMC, one of the leading hospitals in the Fresno area, is effectively unavailable to these HMO patients for nonemergency care under their insurance plans.

According to the complaint, there is a pent-up demand for insurance options that would permit patients to have nonemergency medical care provided at SAMC. To meet that purported demand, First Choice (an IPA) and Saint Agnes Medical Group (a separate physicians group unrelated to First Choice and not a named plaintiff in this action) have attempted to enter the Fresno area HMO market. As part of this effort, First Choice contracted with Choice Physician's Network, Inc. (CPN), a limited license health plan/HMO. CPN has existing contracts with major health plans that operate in the Fresno area, and also has entered an agreement with SAMC. This means that HMO members of health plans that contract with CPN and who select primary care physicians that have contracted with CPN or First Choice "will be able to access physician services through a medical group other than Santé," and will be allowed "to use [SAMC] for hospital care."

In the furtherance of these efforts, "First Choice has entered into contracts with a number of Fresno area physicians, and has tried to recruit, and continues to try and recruit

5.

additional Fresno area physicians." Because Santé's contracts with Fresno area physicians are *nonexclusive*, First Choice has proceeded on the understanding that there was (and is) no impediment to contracting with physicians who were also under contract with Santé.

However, when primary care physicians under contract with Santé attempted to enter into a contract with a competing IPA such as First Choice, Santé allegedly sent threatening communications to the primary care physicians to dissuade them from signing with First Choice, including making threats to reassign or take away the primary care physicians' HMO patients, or insisting that the primary care physicians elect whether they wanted Santé (rather than First Choice) to be the IPA through which the physicians would access their HMO patients. According to the complaint, Santé admitted to sending at least 11 letters, sent by Nick DeBenedetto of Santé to primary care physicians, forcing them to choose between utilizing Santé or First Choice. The letters included the following language:

> "'Please make your election for member assignment, and sign below:
>
> ____ Continue to obtain membership from Santé ….
>
> ____ Begin receiving membership from another IPA. Please begin the disenrollment of my assigned members through [Santé].'"

Other communications by Santé were allegedly made to specialists to dissuade them from contracting with First Choice.

Allegedly, Santé's course of conduct was designed to intimidate physicians in the Fresno area (both primary care physicians and specialists) to keep them from joining or utilizing First Choice (or other competing IPA's), and effectively prevented First Choice, CPN and others from being able to develop their own physicians' network or to engage in meaningful competition with Santé in the Fresno area. The same conduct also allegedly interfered with SAMC's ability to expand HMO member referrals to SAMC for nonemergency hospital care. Santé's actions allegedly constituted "unlawful, unfair and

6.

fraudulent" business practices in violation of section 17200 et seq., and resulted in financial injury to First Choice and SAMC.

Plaintiffs' Motion for Preliminary Injunction and Supporting Evidence

On November 20, 2013, a temporary restraining order was sought by SAMC against Santé on shortened notice. That application was denied by the trial court without prejudice.

On February 25, 2014, plaintiffs filed their motion for preliminary injunction, asserting that Santé had "embarked upon an aggressive campaign of threatening its non-exclusive contracted physicians with the loss of their plan members if those physicians contract with New IPA's which allow referrals to [SAMC]." Plaintiffs contended the requested relief was necessary to protect plaintiffs from further harm pending trial on the merits. Further, the motion asserted that "[p]laintiffs are likely to succeed on the merits of their claims at trial as Santé is breaching the terms of its non-exclusive contracts with its physicians in ways that constitute unfair business practices under the Unfair Competition Law."

Plaintiffs' motion sought to enjoin Santé from engaging in the following acts: "a) Terminating or threatening to terminate its contract with any physician who exercises his/her right to contract with a medical group, IPA or similar physician entity other than Santé ('New IPA'); [¶] b) Re-assigning, re-directing, or transferring, threatening to re-assign, re-direct or transfer, or causing or requesting the re-assignment, re-direction or transfer of any HMO patient assigned to a physician by Santé or any health plan because that physician exercised his/her right to contract with a New IPA; [¶] c) Refusing or threatening to refuse to refer new HMO patients … to any physician who exercises his/her right to contract with a New IPA; [¶] d) Preventing or instructing, or threatening to prevent or instruct, any primary care physician contracted with Santé from making referrals to any specialist physician who is contracted with Santé and has exercised his/her right to contract with a New IPA …; [¶] e) Changing the methodology or rates

7.

pursuant to which any physician is compensated by Santé for the sole reason that a physician has exercised his/her right to contract with a New IPA; [¶] f) Restraining, punishing, retaliating against or otherwise taking any adverse action against any physician who exercises his/her right to contract with a New IPA; [¶] g) Representing to the public or its contracted physicians that it has exclusive contracts with its physicians, when the contracts are, in fact, non-exclusive contracts; [¶] h) Terminating or threatening to terminate its contract with any health plan because a health plan is considering entering into, actively negotiating, or has entered into a contract with a New IPA, or otherwise leveraging Santé's existing direct or indirect relationships with health plans to exclude a New IPA from obtaining contracts with health plans."

In support of their request for such injunctive relief, plaintiffs presented a number of declarations. Without considering yet the evidentiary objections raised to portions of the declarations, we briefly summarize the contents of the declarations offered in support of plaintiffs' motion. A few of the declarations were first filed in connection with the application for temporary restraining order, and were resubmitted by plaintiffs, via a request for judicial notice, in support of the motion for preliminary injunction.

*Declaration of Dr. Richard Winters*

Winters is[4] the President of Saint Agnes Medical Group (not a party in this appeal). Saint Agnes Medical Group is an IPA through which physician members are able to refer patients to SAMC. Concerning efforts to recruit physicians to join Saint Agnes Medical Group, Winters stated: "I recently learned that Santé was taking actions to dissuade physicians by encouraging them to back out of their contracts with [Saint Agnes Medical Group], or pressuring them not to sign up with [Saint Agnes Medical

---

[4] For convenience, we describe the several declarants' professional or occupational capacities in the present tense whenever their declarations did so. Such were their asserted capacities at the time their subject declarations were filed, but we do not know if changes have occurred since then.

8.

Group]." Winters heard or was told that certain physicians or physicians groups were considering joining Saint Agnes Medical Group, but were afraid to do so or backed out because Santé threatened to redirect or take away their HMO patients. He also heard or was told that physicians were afraid that signing with another IPA such as Saint Agnes Medical Group would otherwise negatively affect their existing relationship with Santé.

*Declaration of Stephen Kalomiris*

Kalomiris is the Controller at SAMC, and has served in that position since 1987. Kalomiris stated that prior to 2001, SAMC received a share of Fresno-area HMO patient referrals for nonemergency hospital care through an HMO called ValueCare (later PacifiCare). He noted that in 2001, Santé entered an agreement with PacificCare to move all of PacifiCare's business to Santé, which "effectively removed [SAMC] as an option for these HMO members, since Santé generally does not allow HMO patients assigned to Santé to use [SAMC] for non-emergencies." Kalomiris charted financial percentages reflecting SAMC's annual charges generated from HMO patients during 1997 through 2001, "the years just prior to when Santé cornered the HMO market in the Fresno area." He was not aware of anything that would diminish the demand for HMO members to use SAMC for hospital services, were that option to be made available again. He noted further that SAMC has frequently won Consumer's Choice Awards and has been voted "'Best Hospital'" by The Fresno Bee's People's Choice Awards.

*Declaration of Stacy Vaillancourt*

Vaillancourt is the Chief Administrative Officer for SAMC. Vaillancourt stated in her declaration that SAMC rarely provides nonemergency medical care to HMO patients. That is because in the Fresno area, Santé is the only physician network available to a vast majority of patients with HMO coverage, and Santé's primary care physicians are contractually required to refer patients to Community Medical Centers. She added that "[t]he inability of physician networks or groups such as First Choice Medical Group and Saint Agnes Medical Group" to compete in the Fresno area "prevents HMO patients in

9.

the Fresno community from being able to access covered health care services from [SAMC]."

*Declaration of Dr. Daniel Bluestone*

Although referenced by plaintiffs in support of their motion, this declaration was originally filed by Santé in opposition to plaintiffs' application for temporary restraining order. It was apparently offered by plaintiffs because it showed Santé's awareness that it cannot reassign HMO patients to other doctors. Bluestone, who is Santé's Medical Director, stated in his declaration that Santé, as an IPA, "has not, nor does it have the authority to, assign or reassign HMO member patients from and among primary care physicians that contract with Sante ..., regardless of whether that primary care physician contracts with another independent practice association." Instead, "[t]he decision as to who is a patient's primary care physician is made by the patient" or the HMO, but not the IPA.

*Declaration of Chris Cheney*

This declaration was also originally filed by Santé in opposition to plaintiffs' application for temporary protective order. Here, plaintiffs offered it in support of their motion for preliminary injunction, presumably because Cheney's declaration acknowledged (1) the letters sent by DeBenedetto to 11 primary care physicians and (2) Santé's policy of requiring an election of IPA's in certain circumstances and changing the mode of compensation if another IPA were designated as the IPA through which the physician will access the members.

Cheney, who is Santé's Chief Financial Officer and Chief Operations Officer, explained the letters and the policy behind them as follows: "These letters were sent to those Santé IPA contracted primary care providers that we understood had signed with another IPA that had contracts with the same HMO health plans as Santé IPA.… [¶] … Specifically, Mr. DeBenedetto's letters are referring to the policy contained in Section 200 of the Provider Manual, which provides as follows, '*If a Primary Care*

10.

*Physician belongs to another IPA that has contracts with the same health plans as Santé …, the physician must elect to designate Santé … as the IPA from which they will access the members*.' … [¶] … It is my understanding that this policy has been in place, and unchanged, since 1996. [¶] … This policy is necessary to ensure that Santé IPA is able to properly administer its payments to physicians and other providers, as well as to address certain other administrative challenges that would be experienced by both the providers and Santé IPA if a physician were to accept patients from the same health plans through two or more IPAs." (Italics added.)[5]

Cheney's declaration described some of the background to Santé's policy: "Patients choose their primary care physician at open enrollment and the health plans send[] the IPA an eligibility file containing patients enrolled with Santé IPA. Santé IPA receives a fixed amount each month from the health plan to provide all covered services that are the responsibility of Santé IPA. These include payments to the primary care physician selected by a patient. Primary care physicians can be paid in one of two ways for the services, either capitation or fee for services. A primary care physician that is receiving capitation reimbursement is deemed 'at risk' meaning their assigned patient(s) may incur costs in excess of what the primary care physician receives in the form of capitation reimbursement. Providers paid on a fee for service basis are paid for each service they provide and bill the IPA. Primary care physicians that are capitated are paid a fixed amount per member regardless of the number of services provided. This puts the capitated physician 'at risk' for members who utilize a lot of services. If a primary care physician is getting patient lives through another IPA and that IPA has contracts with the same health plans as Santé IPA, Santé IPA needs to notify the health plan(s) of the primary care physician's intent as to which IPA it wants to receive those patient lives

---

[5] Copies of the DeBenedetto letter and of Santé's administrative document containing the relevant policy language were attached to Cheney's declaration.

11.

through. [¶] … In managed care, the technical term 'enrollee' is given to a patient who is receiving managed care benefits and who is counted as a portion of a primary care physician's 'capitated lives pool.' To an IPA, such as Santé IPA, HMO patients are 'enrollees' because they are 'enrolled in the benefits' of and counted towards the per member per month ('PMPM') capitation payment that the primary care physician receives."

Cheney's declaration elaborated further on the nature and rationale of the policy: "In order to administer its primary care physician contracts, Santé IPA must be able to verify, on a monthly basis via the health plan's eligibility file, which primary care physicians should receive the capitation payment. In addition, the IPA needs to know this information so that it can pay all claims for services provided to that enrollee. Since the monthly capitation payments to Santé IPA are based on health plan member assignments, it is important that the assigned members appear correctly on the eligibility files. Because the members and the health plan, not Santé IPA, are responsible for the assignment of patients, Santé IPA does everything it can to help appropriately identify patients that Santé IPA is financially responsible for. This is because the IPA only receives money for patients that it is responsible for and to erroneously make payments for other members would be financially devastating to Santé IPA. If the primary care physician is a member of two or more IPAs with contracts for the same services with the same health plans, Santé IPA will need to be able to verify if the primary care physician's patients will be counted toward Santé IPA or to the other IPA. In order to allow Santé IPA to verify this information, Santé IPA has adopted the above referenced policy and it is the reason for Mr. DeBenedetto's letter to primary care physicians that were identified as being members in another IPA with contracts for the same services and with the same health plans. Those primary care physicians were requested to elect from which IPA they will receive their patient assignments from. [¶] … If a primary care physician elects to receive patient assignment through another IPA, this election does not change the

12.

primary care physician's 'assigned' patients, but it simply determines from whom the primary care physician will seek reimbursement for that 'assigned' patient. The nature of the policy is to allow physicians who choose to participate in multiple IPAs the opportunity to receive all their members for any given health plan through one IPA. By electing an IPA other than Santé IPA, the health plans can 'disenroll' that patient from Santé IPA and 're-enroll' the patient with the other IPA. Should a primary care physician choose not to elect an IPA through which it receives its patient assignment, Santé IPA would not terminate the primary care physician[']s contract, but would instead reimburse the physician on a fee for service basis."

Finally, Cheney's declaration provided a copy of the older (1995) version of Santé's primary care physician contract. That version did not reference the administrative provider manual in the body of the contract. Cheney asserted that for doctors subject to that older version, "the policy manual is regularly updated and compliance with the manual is a required condition of Santé IPA member physicians." Also attached to Cheney's declaration was a copy of the more current version of Santé's primary care physician contract, which expressly provided at paragraph 6.2: "Professional shall follow policies and procedures as outlined in the Santé Community Physicians' Administrative Provider Manual."

*Declaration of Blair Bryson*

Bryson is the Administrator for CPN and has extensive experience in the field of managed health care. Bryson asserted in his declaration that CPN's status as a limited license health plan "means that it has the option to contract with physicians to provide HMO services either directly, or by having those physicians contract with a medical group [or IPA] with which CPN has a contract." In 2013, CPN "began building the infrastructure necessary to provide service to the Fresno area by contracting with First Choice ...." Bryson described CPN's initial steps to provide service in the Fresno area: "Any health plan that wants to operate in the Fresno area must be able to provide

13.

members with an option for hospital-based care and a network of physicians allowed to refer to that hospital.  In this regard, CPN has entered into an agreement with [SAMC] so that HMO members who choose to access medical care through First Choice can receive hospital services at [SAMC].  CPN has also recruited and assisted First Choice in recruiting a network of physicians who can join their groups and refer their HMO patients to [SAMC]."

According to Bryson, CPN and First Choice have experienced difficulty entering the Fresno health plan marketplace because of alleged actions on Santé's part:  "CPN's and First Choice's efforts to recruit primary care physicians and specialists have been ongoing since at least June 2013.  As of September 2013, twenty-nine (29) primary care physicians had signed contracts with First Choice.  However, since September 2013, I have learned that Santé has been taking action to dissuade physicians so that they would back out of their contracts with First Choice, or to pressure them to not sign up with First Choice or CPN.…  Santé's actions have had a significant effect on physician recruitment, and by extension, enrollment of HMO members by First Choice and CPN."  Bryon asserted that he is "informed and believe[s] that in September 2013, Santé sent letters to numerous physicians who either had signed contracts with First Choice, or were interested in joining First Choice, informing them that they were contractually required to make an election regarding HMO patients that were assigned to them through Santé."  Bryson heard that one physician, Dr. Ben Rad, terminated his contract with First Choice after he received Santé's letter.  Additionally, Bryson stated that one specialist, after receiving a letter from a primary care physician's group known as Logan Street Medical Group (to the effect that it would not be able to refer patients to the specialist if the specialist signed up with another IPA), indicated he would not join First Choice until he was sure that Santé did not have the contractual right to take patients away.  Others, such as the administrator at Tri-County Family Medical Clinic in Kingsburg, told Bryson they

14.

had decided not to proceed with a relationship with First Choice "precisely because of Santé's threats to take away all of their Santé patients."

Bryson also claimed in his declaration that Santé had dissuaded health plans from entering contracts with CPN. In September 2013, Health Net was considering extending their contractual relationship with CPN to cover the Fresno County area through First Choice, but Bryson was informed by someone at Health Net that it declined to do so because Health Net was concerned, based on alleged communications from Santé, that its contracts with both Santé and Community Medical Centers would be at risk.

Bryson further asserted in his declaration that after the November 2013 hearing on the temporary restraining order, Santé engaged in additional actions to dissuade physicians from joining First Choice. For example, Bryson stated he was informed and believed that one First Choice physician, Dr. Pam Janda, who was also a First Choice board member, was contacted by Santé and, soon afterwards, she decided to terminate her contract with First Choice because "she was not willing to take the risk, that she was not 'up for the fight.'" Bryson also heard that Santé had, among other things, ceased making capitation payments to Drs. Narala and Bautista, and had terminated Bautista's contract after accusing him of wrongdoing. Bryson was also informed and believed that one of Narala's patients had been reassigned to a different primary care physician in the Santé network without that patient's authorization, and Narala claimed that Santé had purportedly "'mistakenly'" terminated his contract with Santé and reinstated it over the phone.

According to Bryson, Santé's conduct had an adverse impact on First Choice and CPN: "First Choice's progress in building its physician network has come to a halt and First Choice has steadily lost physicians who [were] actively participating in the group. Out of the twenty-nine (29) primary care physicians who initially signed contracts with First Choice, at least two of them have formally rescinded their contracts, and only eight of them are actively participating in the group and enrolled patients through First Choice

15.

during the Medicare Advantage open enrollment period. Had these twenty-nine (29) primary care physicians actively participated in First Choice during open enrollment, and offered their Medicare Fee-For-Service patients the opportunity to sign up with Humana through First Choice, I believe there would have been thousands of members enrolled through First Choice. However, as of the date of the execution of this Declaration, only one hundred and fifty-six (156) patients have enrolled with First Choice."

*Declaration of Josephine Cuevas*

In August 2013, Cuevas was hired by CPN as a consultant to assist with various facets of CPN's expansion into the Fresno area, including the effort to build a network of contracted primary care physicians and specialists. In September 2013, Cuevas "became aware" that Santé was "taking actions to dissuade physicians from signing up with First Choice" by threatening to take away existing HMO patients or discontinue referrals to physicians who contract with other entities that can provide HMO services in the Fresno area. For example, Cuevas was informed by an office manager at Spruce Multispecialty Group that Dr. Stanley Chang was going to "hold off" on signing with First Choice until the "'situation'" with Santé "'cleared up.'" Another example given by Cuevas was a Dr. Hing Luong, a Fresno-area primary care physician, who was present at a meeting with Cuevas and several physicians signing with First Choice who had received letters from Santé the previous week. Allegedly, "[m]any of the physicians at the meeting expressed their fear of losing all of their Sante patients." Two days after that meeting, Luong's office manager called to inform Cuevas that Luong was pulling out of the First Choice contract and would "'stay with Sante.'" Cuevas informed Luong's office manager that Luong did not have to choose between First Choice and Santé since his contract with Santé was not exclusive, but Luong never called back. Cuevas asserted that as a result of Santé's conduct, her ability to get physicians to join First Choice had effectively been thwarted. CPN was forced to terminate her position.

16.

*Declaration of Diana Kaye Pasillas*

Pasillas is a consultant for CPN, retained to assist with various facets of CPN's expansion into the Fresno area, including building a network of primary care physicians and specialists. Pasillas asserted that in October 2013, she "became aware" that Santé "was taking actions to dissuade physicians from signing up with First Choice," or pressuring them to back out of contracts already signed with First Choice. For example, Pasillas was involved in discussions with administrators at the Cardiac Institute of Central California (CICC), a physicians group that specializes in cardiology and cardiovascular surgery. The administrators indicated CICC would sign up with First Choice, but later declined to do so because CICC physicians were "told by Santé that they could not enter into a contract with First Choice because … it would create a 'conflict of interest' with Santé." Pasillas also spoke with an office manager at Valley Surgical Specialists Medical Group (VSS), who told Pasillas that the physicians at VSS "would not sign the contract because Santé informed VSS that there was a 'conflict' and VSS did not want to risk Santé taking away patients signed up with Santé." Pasillas also heard that several specialists in OB/GYN were informed by their contracting and billing consultant that "Sante believes" there would be "'a conflict of interest'" if they signed up with First Choice. Pasillas asserted that "[a]s a result of Sante's conduct, First Choice's progress in building its physician network has come to a halt and First Choice has steadily lost physicians who are actively participating in the group." Out of the 29 primary care physicians that initially contracted with First Choice, at least two have formally rescinded and only eight are actively participating in the group. Pasillas stated her belief that if all 29 had actively participated in First Choice during open enrollment, there would have been thousands of members enrolled through First Choice, instead of the mere 156 enrolled at the time of Pasillas's declaration.

*Declaration of Dr. Jose Luis Bautista*

Bautista is currently the President of First Choice. Bautista was a primary care physician under contract with Santé. His agreement with Santé required him to refer patients needing nonemergency hospital services to Community Medical Centers. However, the agreement was also nonexclusive. In 2013, Bautista became interested in expanding the pool of HMO members who could select him as primary care physician and in expanding the choice of hospitals that he could offer those members. He therefore contracted with First Choice to provide services to HMO members. Bautista stated in his declaration that in September 2013, he began receiving communications from someone at Santé threatening "to take away all of my patients and refusing to assign me new patients, if I entered into a contract with First Choice." The alleged threats were later embodied in a letter from DeBenedetto, which asked Bautista to choose from which IPA he would like his "'HMO members lives assigned for those plans that contract both with Santé … and other IPA's.'" The letter asked Bautista to elect one of the following: "___ Continue to obtain membership from Santé," or "___ Begin receiving membership from another IPA. Please begin the disenrollment of my assigned members enrolled through [Santé]."

Bautista further explained in his declaration what the consequences would be of a shift from monthly capitation to fee-for-service compensation by Santé. He explained that capitation payments from Santé of a fixed amount "'per member per month'" provided a regular monthly amount to him for each HMO member assigned to him as primary care physician at that time. That capitation amount can be many thousands of dollars each month, and was used by Bautista to cover the overhead for his medical practice, including salaries, equipment, supplies, rent, etc. By contrast, fee-for-service payments would only be paid for specific medical care rendered to specific patients. Bautista also alleged in his declaration that after the hearing on the temporary restraining order, Santé accused Bautista of violating a provision of his primary care physician contract and ultimately terminated Bautista's contract.

*Declaration of Dr. Ajit Khaira*

Khaira was a primary care physician under contract with Santé. Since his contract with Santé was nonexclusive, Khaira signed a contract with First Choice in 2013. According to Khaira, in September 2013, he received a telephone call from DeBenedetto, who informed him that if he joined First Choice, he would "lose all of [his] current Santé patients." Khaira stated that he also received a letter from DeBenedetto, dated September 30, 2013, indicating that he must choose from which IPA he would like his "'HMO members lives assigned for those plans that contract both with Santé … and other IPA's.'" The letter asked that he make an election to either continue obtaining his membership from Santé or, conversely, begin receiving membership from another IPA. On the place in the letter where the latter option (i.e. to receive membership through another IPA) could be selected or initialed, the next sentence added "Please begin the disenrollment of my assigned members enrolled through [Santé]." Khaira stated that "[l]osing all of my Santé patients would be financially devastating to me" and he remains "in fear" that Santé will take away patients. Further, Khaira asserted that after submitting his prior declaration in support of the temporary restraining order, he learned that at least two of his patients had been transferred to another physician within the Santé network for reasons unknown.

*Declaration of Dr. Madhava Narala*

Narala is a primary care physician under contract with Santé. In September 2013, Narala received the letter from DeBenedetto, which stated that Narala must choose from which IPA he would like his "'HMO members lives assigned for those plans that contract both with Santé … and other IPA's.'" The letter contained the identical wording requiring an election of IPA's as indicated above regarding Bautista and Khaira. Narala explained the differences between receiving compensation from Santé on a capitation basis versus a fee-for-service basis. In November 2013, Santé stopped paying Narala on a capitation basis and shifted him to fee-for-service basis for compensation. In January

19.

2014, one patient came to his office for an appointment, but his new health insurance card (issued by Humana) showed the patient was assigned to a different primary care physician within the Santé network. The patient had not requested the change. In February 2014, another patient came to Narala's office and was upset that Narala was no longer a provider under the Santé network. When Narala's office called Santé to inquire regarding the issue, Santé said it was a misunderstanding and reinstated Narala's contract over the phone.

*Declaration of Dr. O'Key Sams*

Sams is a primary care physician under contract with Santé. Sams stated in his declaration that, although he is interested in signing with First Choice to expand his pool of HMO patients and to have the option of sending patients to SAMC, he has decided against doing so because of his concern that "Sante will take away all of my HMO patients and will not assign new patients to me if I do so."

*Declaration of Richard Hidalgo*

Hidalgo was a patient of Narala through his Humana HMO plan. In January 2014, Humana issued an updated insurance card that listed a different primary care physician (not Narala) without Hidalgo's permission. When Hidalgo called Humana to correct the error, no explanation was given, but he was switched back to Narala.

*Declaration of America Ladezma*

America Ladezma had Bautista as her primary care physician through Health Net. At a visit in February 2014, Ladezma was informed that she was no longer assigned to Bautista.

Santé's Opposition to the Motion for Preliminary Injunction

Santé's opposition to plaintiffs' motion for preliminary injunction argued, among other things, that it did not engage in any unfair business practices under the UCL and, therefore, no reasonable probability existed that plaintiffs would prevail at trial. Santé asserted that plaintiffs had misrepresented the nature of the communications made by

20.

Santé to its physicians. Santé argued: "Santé's [primary care physician] members are free to join any additional IPA without limitation. Only in the narrow situation where a [primary care physician] is a member of Santé and another IPA and both IPAs are part of the same HMO's physician network does Santé's policy become effective…. Drs. Khaira and Narala have not been terminated by Santé and have not lost their patients, but are now compensated on a fee for services basis." According to Santé, this policy[6] is not unlawful, unfair or fraudulent, but is simply sound business policy that was "crafted to avoid the confusion that Santé's experience has shown adversely affected both patients and [primary care physicians]." Additionally, Santé argued that since its current version of its primary care physician contract incorporates the administrative provider manual (which sets forth the subject policy), the injunctive relief sought by plaintiffs would directly contravene the contractual promises made to Santé by many physicians not before the court. Furthermore, in considering the balance of harms, the injunctive relief would allegedly disrupt Santé's communication with its contracted physicians and throw into confusion how Santé's contract will be administered.

Santé introduced three declarations in opposition to the motion for preliminary injunction (i.e., the declarations of Bluestone, Cheney and DeBenedetto) and also filed written evidentiary objections. At this point, we summarize the contents of Santé's declarations.

---

[6]  As should be apparent, the policy in view is from Santé's administrative provider manual and states as follows: "If a Primary Care Physician belongs to another IPA that has contracts with the same health plans as Santé …, the physician must elect to designate Santé … as the IPA from which they will access the members."

21.

*Declaration of Dr. Daniel Bluestone*

As noted above, Bluestone is the Medical Director of Santé. As Medical Director, Bluestone's job responsibilities include provider relations, member disputes, provider disputes and utilization review. Bluestone first reiterated what he said in his prior declaration (in opposition to the application for temporary protective order): "Santé has absolutely no ability or authority to assign or reassign HMO member patients to primary care physicians …. The ability to assign or reassign HMO member patients to or from a [primary care physician] is vested with the patient or the HMO health plan."

Bluestone next took issue with the factual accuracy of a number of statements set forth in declarations submitted by plaintiffs. Challenging the declaration of Dr. Bautista, Bluestone disputed whether anyone at Santé told him Santé would "'take away patients'" if he entered a contract with First Choice. Bluestone denied that Santé has ever "retaliated" against Bautista, as Bautista claimed. Rather, Bautista's contract with Santé was eventually terminated for conduct in violation of a provision of his contract with Santé. Multiple attempts were made by Santé over a period of time to allow Bautista to respond to the claim that he violated that contract provision, but Bautista refused to respond. Additionally, Bluestone asserted that Santé did not retaliate against Bautista by discontinuing his capitation payment. Instead: "Dr. Bautista stopped receiving capitation payments from Santé because he did not inform Santé whether he elected to receive his patient lives through Santé for those HMO member patients who were enrolled in an HMO health plan that overlapped with another medical group. Due to his failure to elect, Santé was forced to switch Dr. Bautista's compensation structure from capitation to a fee-for-service to ensure the proper administration of payments and avoid administrative challenges that arise when a physician is [under] contract with multiple IPAs but fails to elect which IPA they will receive member lives from." As to Bautista's claim that some patients were reassigned, Bluestone asserted that "Santé has not reassigned any of

Dr. Bautista's patients to another [primary care physician]. To the extent that any patients were reassigned, this was done by the HMO health plan."

Bluestone also challenged the accuracy of certain statements in Khaira's declaration. Bluestone denied that Santé had, as claimed by Khaira, reassigned any of Khaira's patients to another primary care physician, reiterating that "[o]nly the HMO member patient and the HMO health plans can redirect HMO member patients to a different physician." Bluestone similarly challenged the accuracy of certain statements in the declaration of Narala. Bluestone denied that any of Narala's HMO patients were reassigned by Santé. Bluestone also denied that Santé ever terminated Narala's contract. Finally, as to the declarations of HMO members/patients Richard Hidalgo and America Ladezma, Bluestone stated that if they were reassigned to another primary care physician, it was the result of the conduct of either the HMO patient or the HMO health plan, not Santé. Bluestone noted that sometimes mistaken reassignments occur by inputting error on the part of the HMO or the patient, but Santé has no involvement at all in the process.

*Declaration of Chris Cheney*

As indicated above, Cheney is Santé's Chief Financial Officer and Chief Operations Officer. In his role with Santé, his responsibilities include overseeing of capitation receipts and payments to physicians and other providers. In his declaration in opposition to the motion for preliminary injunctions, Cheney briefly outlined Santé's role as an IPA, the manner in which Santé is paid by HMO's to provide medical care through its contracted physicians, and Santé's contracts with its individual physicians. Cheney affirmed that Santé has "no ability to effectuate an assignment or reassignment of an HMO member patient to a [primary care physician]." Cheney also summarized how hospital services are handled under the HMO model: The HMO contracts with the hospital regarding the hospital's fees, and the IPA contracts with the hospital-based providers such as anesthesiologists, pathologists and hospitalists. He stated: "In order for an HMO member patient to be seen at a hospital for non-emergent services while not

23.

jeopardizing the financial stability of the HMO model, the HMO health plan will have a contract with a specific hospital and the IPA will have a contract with the hospital based providers." Regarding the Fresno area hospitals, Cheney explained: "The HMO health plans that Santé has contracted with also have contracts with Community Medical Centers. Santé, in turn, has contracted with Community Medical Centers' hospital based providers to provide services to its HMO member patients. As such, Santé member patients will typically be seen at Community Medical Centers' locations for non-emergent hospital treatment. [¶] … In addition, some HMO health plans contracted with Santé also have contracts with [SAMC]. Santé has attempted to negotiate contracts with SAMC's hospital based providers; however, these providers refused to enter into a contract with Santé."

Expanding on what was said in his prior declaration, Cheney reiterated that Santé's administrative provider manual states in pertinent part as follows: "'If a Primary Care Physician belongs to another IPA that has contracts with the same health plans as Santé …, the physician must elect to designate Santé … as the IPA from which they will access the members.'" According to Cheney, "[t]his policy involves a limited subset of patients allocated to [primary care physicians] in the IPA." Specifically: "[Primary care physicians] that contract with two or more IPAs that also contract with the same HMO health plan, such as Blue Shield, are required to decide through which IPA they want to be paid for services provided to those patients. [¶] … If a [primary care physician] affirmatively elects to receive his or her patients through another IPA, Santé may inform the HMO health plan that contracts with both Santé and that other IPA that the [primary care physician] has elected to receive his patients through the other IPA. To date, Santé has not notified HMO health plans that a [primary care physician] has elected to receive his or her patients through First Choice or Saint Agnes Medical Group. [¶] … If the [primary care physician] affirmatively elects to receive his or her patients through another IPA, the [primary care physician's] contract with Santé is not terminated, the patients are

24.

not transferred by Santé to another Santé provider, and patients are not kicked off their health plan, but instead the [primary care physician] is converted from an at-risk capitation fee structure to a fee-for-service pay structure. This conversion is to ensure that [primary care physicians], regardless of which IPA they access patients through, are compensated for services they actually provide while ensuring that the IPA is not exposing itself to potential collection issues that arise when multiple IPAs are involved. [¶] … This policy avoids prior authorization confusion, payment to multiple physicians for the same patient and/or patient services and the administrative nightmare that will result. This policy has been in place since around 1996 due to similar issues involving multiple IPAs contracted with the same HMO plans in the past."

Finally, Cheney asserted that no primary care physicians have been terminated from their Santé contracts as a result of their decision to receive membership through another IPA. "While Dr. Bautista's contract was terminated by Santé, this termination was the result of Dr. Bautista's violation of Section 12.11 (Non-Solicitation of Enrollees) of his contract with Santé. Importantly, Santé informed Dr. Bautista of the information Santé had obtained that constituted a violation of Section 12.11 and provided him with an opportunity to respond. Rather than address this issue, Dr. Bautista refused to respond."[7]

*Declaration of Nick DeBenedetto*

DeBenedetto is employed by Santé in its Provider Relations, Managed Care division. One of his job responsibilities is "to address issues that may arise between a physician and Santé relating to their Primary Care Physician Agreement." DeBenedetto disputed the statement in Khaira's declaration that accused DeBenedetto of telling Khaira he would "lose all of his current Santé patients if he joined First Choice." DeBenedetto stated that he never said such a thing to Khaira. Instead, according to DeBenedetto, he informed Khaira that "Santé policy required that he elect which IPA he would take his

---

[7] We note Bautista became the President of First Choice.

25.

member lives through for those HMO health plans that were contracted with both Santé and another IPA." DeBenedetto also disputed assertions set forth in other declarations submitted by plaintiffs.

In addition to the above declarations, Santé's opposition included extensive written objections to many of the assertions set forth in the declarations submitted by plaintiffs, including objections based upon hearsay.

Plaintiffs' Reply Papers

Plaintiffs' reply papers argued the evidence adequately showed that Santé was engaging in unfair and heavy-handed tactics to prevent competition, even though Santé's contracts with its physicians were supposed to be nonexclusive. Among other things, plaintiffs' reply emphasized that Santé acknowledged it (1) sent the DeBenedetto letters (including the disenrollment language) to 11 primary care physicians, (2) required primary care physicians who signed up with First Choice to elect which IPA to utilize HMO members though, and (3) if First Choice (or another IPA besides Santé) was so designated, it converted the physician's mode of compensation from capitation to fee-for-services. Plaintiffs also responded to Santé's evidentiary objections and made several evidentiary objections of their own.[8]

Trial Court's Decision Denying the Motion

On April 15, 2014, the parties appeared through counsel at the hearing of the motion for preliminary injunction and presented oral argument. After oral argument, the trial court took the matter under submission. On May 14, 2014, the trial court issued its written order on preliminary injunction (the order). After summarizing the evidence and the parties' respective arguments, the trial court noted the two factors it must evaluate: "(1) The likelihood that the applicant will prevail on the merits at trial; and (2) The

---

[8] The trial court did not sustain or rule on plaintiffs' evidentiary objections, and it appears such objections were implicitly overruled.

26.

balance of any interim harm to the applicant if the injunction is denied compared with the harm to the responding party if the injunction is issued." In its evaluation of the first factor, the trial court stated: "The problem here [with plaintiffs' showing] is with the evidence, or better stated, the lack of evidence. Most of it is flat-out hearsay. Listing what various people said as 'A and B said this' and 'I am informed and believe' and 'Santé said this' without saying *who* at Santé 'said this' demonstrates the evidence to be extremely weak." Additionally, the trial court stated that the claims of wrongdoing were effectively countered by Santé's declarations explaining events in light of the complex or confusing health care system. For these reasons, the trial court found that "plaintiffs simply haven't demonstrated they are likely to prevail."

Finally, the trial court observed the complaint included damage causes of action and First Choice "hasn't adequately stated why damages would not provide a clear remedy." Even though proof of damages would be challenging considering that First Choice is a new business, the trial court believed that plaintiffs' counsel would be able to "put forth a model for damages" that were allegedly sustained. On the foregoing grounds, the trial court denied plaintiffs' motion for a preliminary injunction.

Plaintiffs' timely notice of appeal followed.

## DISCUSSION

### I. Overview of Unfair Competition Law

Plaintiffs' request for a preliminary injunction was based on their claim that Santé was engaged in practices that violated the UCL (section 17200 et seq.). Before proceeding further, we briefly summarize the nature of a UCL cause of action.

"The UCL prohibits, and provides civil remedies for, unfair competition, which it defines as 'any unlawful, unfair or fraudulent business act or practice.' (§ 17200.) Its purpose 'is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services.' [Citations.]" (*Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 320 (*Kwikset*).) "It governs 'anti-competitive business

27.

practices' as well as injuries to consumers, and has as a major purpose 'the preservation of fair business competition.'" (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co*. (1999) 20 Cal.4th 163, 180 (*Cel-Tech*).) Remedies under the UCL are equitable in nature, meaning that a prevailing plaintiff is limited to injunctive relief and restitution. (*Cel-Tech*, *supra*, at p. 179.)

Because the terms "unlawful, unfair *or* fraudulent" are set forth in the disjunctive, the UCL establishes three varieties of unfair competition. (*Cel-Tech*, *supra*, 20 Cal.4th at p. 180.) By proscribing "'*any unlawful*'" business practice, the UCL in effect borrows violations of other laws and treats them as unlawful practices that are independently actionable under the UCL. (*Cel-Tech*, *supra*, 20 Cal.4th at p. 180, italics added.) Virtually any statute, law or regulation can serve as a predicate for a UCL unlawful practice violation. (*Klein v. Chevron U.S.A., Inc*. (2012) 202 Cal.App.4th 1342, 1383.) An "*unfair*" business practice, at least in the context of UCL actions involving business competitors, is "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." (*Cel-Tech*, *supra*, 20 Cal.4th at p. 187, fn. omitted [crux of unfairness inquiry is injury to competition].) Generally speaking, a business practice is considered *fraudulent* under the UCL if targeted members of the public are likely to be deceived by it. (*Bank of the West v*. *Superior Court* (1992) 2 Cal.4th 1254, 1267.) To maintain a cause of action under the UCL, a party must be able to show it actually suffered economic injury or injury in fact as a result of the unfair business practice. (*Kwikset*, *supra*, 51 Cal.4th at pp. 322–324 [construing a voter initiative adding standing and causation elements relating to injury in fact]; § 17204.)

## II.   Standard of Review

When a trial court considers whether or not to issue a preliminary injunction, it "'should evaluate two interrelated factors.'" (*Cohen v. Board of Supervisors* (1985) 40 Cal.3d 277, 286 (*Cohen*).) "'The first is the likelihood that the plaintiff will prevail on the merits at trial. The second is the interim harm that the plaintiff is likely to sustain if the injunction were denied as compared to the harm that the defendant is likely to suffer if the preliminary injunction were issued. [Citations.]'" (*Ibid.*; accord, *IT Corp. v. County of Imperial* (1983) 35 Cal.3d 63, 69–70 (*IT Corp.*).) Weighing these factors lies within the trial court's broad discretion. (*Cohen*, *supra*, at p. 286; *Smith v. Adventist/West Health System* (2010) 182 Cal.App.4th 729, 749.) The granting or denying of a preliminary injunction is not a determination of the merits of the case (*Cohen*, *supra*, at p. 286), but is simply a decision on whether such extraordinary provisional relief is warranted prior to the trial on the merits (see *Tahoe Keys Property Owners' Assn. v. State Water Resources Control Bd.* (1994) 23 Cal.App.4th 1459, 1471).

As accurately noted in Witkin's treatise on California procedural law: "Injunction has long been regarded as an extraordinary remedy that should be granted with great caution. This is particularly true of injunctions pending litigation, issued before a trial on the merits. Even though the plaintiff makes a strong showing of the conditions that might ultimately support a final judgment granting a permanent injunction, that showing may be controverted by the defendant, and at this early stage the case may be regarded as a 'doubtful' one. Moreover, a strong showing of the grounds for equitable relief and therefore of the ultimate right to a permanent injunction is not the equivalent of a showing of a pressing need for immediate temporary relief. Hence, the discretion in deciding against provisional injunctive relief is seldom disturbed." (6 Witkin, Cal. Procedure (5th ed. 2008) Provisional Remedies, § 355, p. 299.)

The ruling on an application for a preliminary injunction rests in the sound discretion of the trial court, and the exercise of that discretion will not be disturbed on

appeal absent a clear showing of abuse. (*Cohen*, *supra*, 40 Cal.3d at p. 286; *Continental Baking Co. v. Katz* (1968) 68 Cal.2d 512, 527.) "When a trial court denies an application for a preliminary injunction, it implicitly determines that the plaintiffs have failed to satisfy either or both of the 'interim harm' and 'likelihood of prevailing on the merits' factors. On appeal, the question becomes whether the trial court abused its discretion in ruling on *both* factors. Even if the appellate court finds that the trial court abused its discretion as to one of the factors, it nevertheless may affirm the trial court's order if it finds no abuse of discretion as to the other." (*Cohen*, *supra*, at pp. 286–287.) "Where the evidence with respect to the right to a preliminary injunction is conflicting, the reviewing court must 'interpret the facts in the light most favorable to the prevailing party and indulge in all reasonable inferences in support of the trial court's order.'" (*Gleaves v. Waters* (1985) 175 Cal.App.3d 413, 416–417.)

A trial court will be found to have abused its discretion "only when it has '"exceeded the bounds of reason or contravened the uncontradicted evidence."' [Citations.]" (*IT Corp.*, *supra*, 35 Cal.3d at p. 69.) Further, the burden rests with the party challenging the order to make a clear showing of abuse of discretion. (*Ibid*.) Similarly, a trial court's ruling on admissibility of evidence is reviewed for abuse of discretion and, as a general rule, will not be disturbed unless the trial court exercised its discretion in "'an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. [Citation.]'" (*People v. Kovacich* (2011) 201 Cal.App.4th 863, 884.)

## III. Denial of the Motion Was Within Trial Court's Broad Discretion

As noted, the trial court denied the motion for preliminary injunction primarily because it concluded that plaintiffs had failed to show a likelihood of prevailing on the merits at trial. In the present appeal, in attempting to show abuse of discretion, plaintiffs first argue that the trial court erred by broadly sustaining Santé's hearsay objections. After briefly framing the hearsay issue and the parties' positions below, we shall explain

why that evidentiary ruling, even if erroneous, did not result in a prejudicial abuse of discretion in this case, because the trial court also found that Santé's declarations countered the claims of wrongdoing asserted by plaintiffs, and in our estimation that showing by Santé was sufficient to establish that the trial court's order denying the motion for preliminary injunction did not exceed the bounds of reason.[9]

### A. Hearsay Evidence Ruling

Hearsay is defined in the Evidence Code as "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) Except as otherwise provided by law, hearsay evidence is inadmissible. (*Id*., subd. (b).) If the evidence involves double or multiple layers of hearsay, the question of admissibility depends on whether each hearsay statement comes within an exception to the hearsay rule. (*People v. Thoma* (2007) 150 Cal.App.4th 1096, 1103; Evid. Code, § 1201.) As noted, the trial court found that much of the evidence presented by plaintiffs was "flat-out hearsay[, l]isting what various people said as 'A and B said this' and 'I am informed and believe' and 'Santé said this' without saying *who* at Santé 'said this ....'" Additionally, regardless of the state of mind exception to the hearsay rule, the trial court indicated it would not permit plaintiffs to substantiate the essential facts constituting plaintiffs' UCL case (i.e., the nature of the alleged threats against physicians) based upon mere information and belief or what someone else told the declarants Santé may have communicated.

In support of the trial court's hearsay ruling, Santé notes that key portions of several of the declarations filed by plaintiffs (i.e., the declarations of Bryson, Pasillas, Cuevas and Winters) consisted of assertions by those individuals of what *other* persons

---

[9] We so construe the trial court's reasoning expressed in its order. In any event, we think this evidence showed the order was within the bounds of reason even if it had not been expressly mentioned as one of the considerations that moved the trial court. (*People v. Zapien* (1993) 4 Cal.4th 929, 976.)

(e.g., physicians or medical office administrators) told them concerning the nature of what Santé purportedly had said or communicated to dissuade said other persons from entering a contract with First Choice or CPN. We agree with Santé that a number of key assertions in the declarations of Bryson, Pasillas, Cuevas and Winters fall into that category. According to Santé, the out-of-court statements were offered to prove the truth of the matters asserted therein regarding the nature or content of Santé's communications that were purportedly designed to keep such others from joining First Choice or CPN. Hence, Santé maintains that the trial court correctly sustained the hearsay objections.[10]

Plaintiffs argue, as they did in the trial court, that the evidence was admissible for purposes other than to prove the truth of the matter asserted, including to show the effect of Santé's statements on physicians, to explain the physicians' conduct, and/or to show the fact that Santé made statements to physicians that caused them to be fearful about the consequences of contracting with First Choice or CPN. In addition, plaintiffs argue such evidence was admissible under hearsay exceptions such as to prove the physicians' states of mind. (See Evid. Code, §§ 1250–1251.) According to plaintiffs, the trial court not only erred in sustaining the overly broad hearsay objection, but also erred by doing so without adequately considering plaintiffs' several arguments for admissibility.

We find it unnecessary to resolve the many hearsay issues and/or exceptions outlined above because the trial court *also* indicated that plaintiffs' claims of wrongdoing were countered by Santé's showing in opposition to the motion. As explained below, we believe this alternate basis for the trial court's conclusion provides sufficient grounds to uphold the trial court's denial of pretrial injunctive relief in this case.

---

**10** Further, Santé made the point that First Choice could have avoided the objectionable use of secondhand hearsay accounts by issuing subpoenas to obtain the testimony of the persons who were allegedly witnesses as referenced in the declarations of Bryson, Pasillas, Cuevas and Winters. Plaintiffs may still do so prior to the trial on the merits.

B.  Alternate Basis for Trial Court's Ruling

We begin by elaborating on the alternate basis for the trial court's decision to deny preliminary injunction, since the language of the order is arguably ambiguous. In its order, after referring to much of plaintiffs' evidence as"hearsay, the trial court went on to describe the same evidence as extremely *weak* to the extent that it was based on information and belief or asserted that "'Santé said this' without saying *who* at Santé 'said this.'" It is apparent from the next sentence of the trial court's order that its assessment of the evidence as weak was not merely in reference to the type of evidence, but was also a result of weighing all of the evidence in relation to Santé's opposition evidence. In concluding that plaintiffs failed to make an adequate showing of likelihood of prevailing on the merits, the trial court referred to Santé's declarations that, the court said, countered plaintiffs' evidence by explaining events in light of the confusing medical health care system and bureaucracy. We take this to mean that the trial court found Santé's explanation of its dealings with contracted physicians—i.e., that Santé was reasonably administering its contract and policy within a complex HMO/IPA health care system—was sufficiently credible as to make plaintiffs' relative likelihood of success appear more doubtful or uncertain, even if there had been no hearsay problems relating to plaintiffs' showing.

So stated, it is necessary for us to consider whether the trial court's order denying relief was and is sustainable on the above ground. In addressing that question below, we largely focus our attention on the nature of Santé's evidence in relation to what appears to be plaintiffs' most direct and forceful evidence in connection with the motion—namely, the letters sent by Santé along with other practices expressly admitted to by Santé in its opposition to the motion.

C.  Evidence Sufficient to Show Trial Court Did Not Exceed Bounds of Reason

Before discussing Santé's opposition evidence, we take stock of some of the more considerable evidence referred to by plaintiffs to show that Santé allegedly engaged in

33.

unlawful, unfair or fraudulent business practices designed to dissuade physicians from signing with First Choice or other IPA's. The evidence included matters that were direct and nonhearsay. This direct evidence consisted of matters expressly acknowledged or admitted by Santé, and confirmed in declarations of several primary care physicians (e.g., Bautista, Khaira and Narala),[11] including the facts that (1) Santé sent letters to physicians who joined another IPA, requiring them to make an election, (2) if a different IPA were selected, Santé would alter the physician's mode of compensation from capitation to fee-for-services, and (3) Santé based such actions on an asserted policy contained in its administrative provider manual. The referenced policy stated: "If a Primary Care Physician belongs to another IPA that has contracts with the same health plans as Santé …, the physician must elect to designate Santé … as the IPA from which they will access the members." The policy was purportedly contained in Santé's administrative provider manual. Santé acknowledged that the older versions of its physician's contract did not include an express provision incorporating the policies of the administrative provider manual, but the later versions of the contract have done so.[12] The letters that Santé admits it sent to at least 11 primary care physicians pursuant to the above policy included certain disenrollment language, stating (if another IPA were selected) "Please begin the disenrollment of my assigned members enrolled through [Santé]."

---

**11** We do not include in this discussion all of the statements contained in declarations of the three primary care physicians, since some statements therein were controverted by Santé's representatives. (E.g., Khaira's assertion that DeBenedetto told him Santé would "take away" all of his HMO patients if he joined First Choice, which was expressly denied by DeBenedetto.) That is because of the following principle: "Where the evidence with respect to the right to a preliminary injunction is conflicting, the reviewing court must 'interpret the facts in the light most favorable to the prevailing party and indulge in all reasonable inferences in support of the trial court's order.'" (*Gleaves v. Waters*, *supra*, 175 Cal.App.3d at pp. 416–417.)

**12** As to physicians subject to the older versions of the contract, Cheney asserted (on Santé's behalf) that those physicians would nevertheless be aware of the provider manual (since it was regularly updated) and in context would understand that compliance with it was expected of Santé's physician members.

34.

Did the trial court abuse its discretion in denying the motion in the face of the above evidence? The crux of the matter, it seems to us, is whether the letters sent by DeBenedetto on Santé's behalf to primary care physicians requiring an election, and/or the consequences indicated by Santé if a physician elected another IPA, were sufficient to establish that the trial court abused its discretion. We discuss such questions below, keeping in mind that a trial court will be found to have abused its discretion "only when it has '"exceeded the bounds of reason or contravened the uncontradicted evidence."'" [Citations.]" (*IT Corp.*, *supra*, 35 Cal.3d at p. 69.)

One of the principal theories of plaintiffs' case was that Santé was engaged in unfair, unlawful or fraudulent practices by means of threatening to reassign patients to another primary care physician if the physician utilized another IPA besides Santé. Supporting plaintiffs' position, we note the 11 letters sent by Santé to primary care physicians not only required an election but referred to a *disenrollment* that would begin if Santé were not designated. Although Santé insisted that it could not reassign patients from a primary care physician under an HMO plan, and denied that it was threatening to do so, the wording in the letters to "[p]lease begin the disenrollment of my assigned members enrolled through [Santé]" if another IPA were selected, was at best unclear and at worst potentially misleading.

In opposing the motion, Santé argued that when viewed carefully and in context, the letters were not saying what plaintiffs claimed. In his two declarations, Cheney provided a lengthy explanation of the above letters and the wording used in an effort to show that Santé was not threatening to reassign or take away patients. First, Cheney noted that the term "enrollee" is often used in a technical sense in the managed care setting to mean those who will be counted toward a primary care physician's "'capitated lives pool'" for purposes of the physician's compensation, or those who are "counted towards the per member per month capitation … payment that the primary care physician receives." If Cheney is correct that the wording was concerned with the mode of

35.

compensation through the IPA, then arguably it was not relating to the reassignment of patients from one primary care physician to another under the patients' health plan.

Second, Cheney explained at length the actual purpose and effect of the election called for in the letters in the context of the IPA model: "In order to administer its primary care physician contracts, Santé … must be able to verify, on a monthly basis via the health plan's eligibility file, which primary care physicians should receive the capitation payment. In addition, the IPA needs to know this information so that it can pay all claims for services provided to that enrollee. Since the monthly capitation payments to Santé … are based on health plan member assignments, it is important that the assigned members appear correctly on the eligibility files. Because the members and the health plan, not Santé …, are responsible for the assignment of patients, Santé … does everything it can to help appropriately identify patients that Santé … is financially responsible for. This is because the IPA only receives money for patients that it is responsible for and to erroneously make payments for other members would be financially devastating to Santé ….. If the primary care physician is a member of two or more IPAs with contracts for the same services with the same health plans, Santé … will need to be able to verify if the primary care physician's patients will be counted toward Santé … or to the other IPA. In order to allow Santé … to verify this information, Santé … has adopted the above referenced policy and it is the reason for Mr. DeBenedetto's letter to primary care physicians that were identified as being members in another IPA with contracts for the same services and with the same health plans. Those primary care physicians were requested to elect from which IPA they will receive their patient assignments from. [¶] … If a primary care physician elects to receive patient assignment through another IPA, this election does not change the primary care physician's 'assigned' patients, but it simply determines from whom the primary care physician will seek reimbursement for that 'assigned' patient…. By electing an IPA other than Santé …, the health plans can 'disenroll' that patient from Santé … and 're-enroll' the

patient with the other IPA."  "If a [primary care physician] affirmatively elects to receive his or her patients through another IPA, Santé may inform the HMO health plan that contracts with both Santé and that other IPA [of the fact] that the [primary care physician] has elected to receive his patients through the other IPA.  To date, Santé has not notified HMO health plans that a [primary care physician] has elected to receive his or her patients through First Choice or Saint Agnes Medical Group.  [¶]  … If the [primary care physician] affirmatively elects to receive his or her patients through another IPA, the [primary care physician] contract with Santé is not terminated, the patients are not transferred by Santé to another Santé provider, and the patients are not kicked off their health plan, but instead the [primary care provider] is converted from an at-risk capitation fee structure to a fee-for-service pay structure."

We are unable to conclude the trial court abused its discretion on this issue. Although the wording of Santé's letters (referencing disenrollment) was problematic and arguably supported plaintiffs' theory of the case, Cheney's declarations presented at least some evidence to shed light on the particular wording of the letters and furnished a measure of support for Santé's position that it was not, as plaintiffs claimed, representing that Santé would reassign or take away the primary care physician's patients.  Hence, we do not believe that the letters' reference to disenrollment was sufficient, by itself, to warrant a reversal of the trial court's order.[13]  Again, our task is not to reweigh the evidence as though we were the actual decisionmaker exercising discretion, but rather to determine whether the trial court's ruling exceeded the bounds of reason or contradicted uncontroverted evidence.

---

[13]     The disenrollment wording did not necessarily create a violation of the UCL.  Perhaps physicians familiar with the IPA context would have (or should have) reasonably understood the wording of the letter in the technical sense described by Cheney.  On the other hand, if Santé used the particular wording of the letter to effectively mislead or threaten physicians into believing their patients would be reassigned if they designated another IPA, plaintiffs' case under the UCL would appear to have substantial merit.

Other aspects of the evidence tended to further support the trial court's ruling. For example, the letters in question did not deny the physician's right to enter contracts with other IPA's (i.e., Santé's physician contracts were *nonexclusive*), but simply required, consistent with Santé's policy as stated in its provider manual, that the physician "choose from which IPA [the physician] would like [his or her] HMO member lives assigned for those plans that contract both with Santé … and other IPAs." As Cheney described it, the policy meant that "[primary care physicians] that contract with two or more IPAs that also contract with the same HMO health plan, such as Blue Shield, are required to decide through which IPA they want to be paid for services provided to those patients." Furthermore, Santé's declarations presented what appear to be sound administrative reasons for having a policy in place to address the situation of overlapping IPA's involving the same HMO plan and patients. For example, in addition to what has been recited above, Cheney's declarations asserted that such a policy was needed "to ensure that Santé … is able to properly administer its payments to physicians and other providers, as well as to address certain other administrative challenges that would be experienced by both the providers and Santé … if a physician were to accept patients from the same health plans through two or more IPAs." More specifically, Cheney explained that the policy "avoids prior authorization confusion, payment to multiple physicians for the same patient and/or patient services and the administrative nightmare that will result." We believe that such explanatory and background information provided at least some evidence to suggest that Santé may have been carrying out reasonable administrative policies in the context of the complexities of the IPA/HMO models, rather than engaging in anti-competitive practices that were likely to be found unfair or fraudulent or unlawful.

There was also evidence that the subject policy had been in place for a long time, that it was expressed in an administrative provider manual document that physicians would have been made aware of, and that more recent versions of the physicians' contracts expressly required physicians to "follow policies and procedures" that were

outlined in Santé's administrative provider manual. These facts provided some evidence to indicate that the policy was at least arguably within the reasonable contractual expectations of many of the physicians under contract with Santé.

In making these observations, we reiterate our limited role in considering the above evidence and the inferences such evidence might allow. We are not adjudicating or determining any ultimate facts or issues, and we are not suggesting what the trier of fact should decide when the matter goes to trial on the merits. We are not saying that plaintiffs will not prevail at trial. Nor is the test whether we would have made the same decision as the trial court. Rather, we are merely pointing out, for purposes of our deferential review of the trial court's ruling to deny the motion for preliminary injunction, that the state of the evidence was such that the trial court did not exceed the bounds of reason on the record that was before it in finding that plaintiffs were not likely to prevail on the merits.

One final matter raised by plaintiffs had to do with something Santé *failed* to present in the trial court. Santé had asserted in its opposition to the motion that where a primary care physician elects to receive his or her patients through another IPA, the patients are not transferred or reassigned from the primary care physician, "but instead the [primary care physician] is converted from an at-risk capitation fee structure to a fee-for-service pay structure." In making that assertion, Santé's declarations did not identify any contractual or policy provision expressly allowing Santé to convert the mode of compensation from capitation to fee-for-services in such cases. Seizing on this gap in Santé's presentation, plaintiffs argue that Santé's practice of changing (or threatening to change) a physician's mode of compensation from capitation to fee-for-services was not premised on any existing contractual provision or binding policy, but rather was *unilaterally* imposed by Santé to unfairly dissuade physicians from utilizing First Choice or other IPA's. The problem we have with plaintiffs' argument at this stage is that Santé's opposition evidence was in response to the predominant assertion in plaintiffs'

39.

motion—namely, that Santé was threatening *to reassign* or *take away* patients. Hence, that is what Santé's declarations addressed. Plaintiffs did not raise the issue of whether or not the change in mode of compensation was beyond Santé's authority, at least not in any clear or meaningful way, until the filing of their reply. In any event, we are unable to conclusively ascertain from the record (and plaintiffs' cursory analysis thereof) whether or not Santé's practice of changing the mode of compensation in such cases was potentially within Santé's rights or not. The burden is on the party challenging the order to make a clear showing of abuse of discretion. (*IT Corp*, *supra*, 35 Cal.3d at p. 69.) Plaintiffs have not done so regarding this matter.

D. Conclusion

In denying the motion for preliminary injunction, the trial court found that plaintiffs were not likely to prevail on the merits. Considered under the deferential abuse of discretion standard, we are unable to conclude that the trial court's determination of the motion on that ground exceeded the bounds of reason or contravened the uncontradicted evidence. (*IT Corp*, *supra*, 35 Cal.3d at p. 69.) To the contrary, the trial court's ruling had sufficient evidentiary support in the record to be within the bounds of the trial court's broad and reasonable discretion. Accordingly, the trial court's order denying the motion for preliminary injunction is hereby affirmed. In light of this ruling, we need not address the additional rationale set forth in the order (i.e., that damages provided plaintiffs with an adequate legal remedy) or Santé's further argument (i.e., that plaintiffs lacked standing under injury in fact standard).

One final comment: The trial court remarked in its order that the medical care system and layers of bureaucracy were so "confusing" in this case that even the doctors would have difficulty grasping how it works. The trial court's remarks were, among other things, a reflection of the court's cautious approach to the notion of imposing extraordinary injunctive relief, without the benefit of a full trial on the merits, into the highly complicated array of medical, contractual and bureaucratic relationships affecting

40.

the administration of medical care in the Fresno area. Given the complexities of this field, and the importance of the issues, the trial court's caution was entirely understandable.

## **DISPOSITION**

The order of the trial court is affirmed. Costs on appeal are awarded to Santé.

_____
KANE, J.

WE CONCUR:


_____
LEVY, Acting P.J.


_____
GOMES, J.

41.